893 P.2d 176

**Wayne DINES, Petitioner–Appellant,**

**v.**

**PACIFIC INSURANCE COMPANY, LTD., Respondent–Appellee.**

No. 17433.

Supreme Court of Hawai'i.

April 13, 1995.

Dissenting Opinion Amended
April 13, 1995.

Majority Opinion Amended
April 17, 1995.

Reconsideration Denied April 24, 1995.

Larry Mark Polsky and Burton D. Gould of Polsky & Gould, on the briefs, Paia, Maui, for petitioner-appellant Wayne Dines.

Glenn J. Stanford and Gary W.K. Au Young, on the briefs, Honolulu, for respondent-appellee Pacific Ins. Co., Ltd.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

LEVINSON, Justice.

The petitioner-appellant Wayne Dines appeals the order of the second circuit court denying his petition to compel arbitration with his automobile liability insurance carrier, the respondent-appellee Pacific Insurance Company, Ltd. (Pacific), regarding his claim for uninsured motorist (UM) benefits. The outcome of Dines's appeal turns on whether, under Hawai'i law, a named insured under an *automobile* liability insurance policy, who is injured by a hit-and-run driver, can be entitled to UM .benefits thereunder when the named insured is operating a *motorcycle* at the time of his accident. Because we hold that the named insured can, we reverse the circuit court's order denying Dines's petition to compel arbitration and remand this matter to the circuit court for the entry of an order granting Dines's petition.

## I. *BACKGROUND*

On. May 5, 1993, Dines allegedly lost control of his motorcycle when a driver of an unidentified automobile failed to yield the right-of-way at an intersection. Dines reported the accident to his automobile liability insurer, Pacific, by way of a certified letter mailed on June 3, 1993, and claimed UM benefits. Pacific received the letter on June 4, 1993,[1] but refused to accept Dines's claim.

At the time of the accident, Dines was the named insured under two relevant liability insurance policies. The first was issued by Progressive Companies (Progressive) and covered his motorcycle. Progressive's motorcycle policy contained bodily injury liability limits of $35,000.00 per person but did not include any optional UM coverage because Dines had expressly rejected it. The second, issued by Pacific, covered Dines's two automobiles and included UM coverage with limits of $250,000.00 per person and $500,000.00 per accident. Pacific's automobile policy included an arbitration agreement that provided that if Pacific and Dines could not agree on "[w]hether [Dines] [was] legally entitled to recover damages ... [or] [a]s to the amount of damages[,] either party [could] make a written demand for arbitration."

On June 30, 1993, Dines demanded that Pacific arbitrate his UM claim pursuant to the arbitration agreement. Pacific refused. Pursuant to Hawai'i Revised Statutes (HRS) § 658-3 (1985),[2] Dines then filed a petition in the second circuit court seeking to compel Pacific to arbitrate his UM claim. When the circuit court denied his petition, Dines timely appealed.

## II. *STANDARD OF REVIEW*

A petition to compel arbitration is reviewed *de novo*, "using the same standard employed by the trial court and based upon the same evidentiary materials as were before [it] in determination of the motion." *Koolau Radiology, Inc. v. Queen's Medical Center*, 73 Haw. 433, 439–40, 834 P.2d 1294, 1298 (1992) (citations and internal quotation marks omitted). We therefore apply the "right/wrong" test to the circuit court's order denying Dines's petition.

---

1. *See infra* note 15.

2. HRS § 658–3 (1985) provides in relevant part:
 **Compelling compliance with agreement; jury trial when.** A party aggrieved by the failure, neglect, or refusal of another to perform under an agreement in writing providing for arbitration, may apply to the circuit court for an order directing that the arbitration proceed in the manner provided for in the agreement. ... The court shall hear the parties, and upon being satisfied that the making of the agreement or the failure to comply therewith is not in issue, the court hearing the application shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the agreement or the default is in issue, the court shall proceed summarily to the trial thereof.

## III. THE CONTROLLING STATUTE, APPLICABLE LEGAL PRINCIPLES, AND THE PLAIN LANGUAGE OF PACIFIC'S AUTOMOBILE POLICY

### A. The Controlling Statute As Affected By Applicable Legal Principles

As of May 5, 1993 (the date of Dines's accident), UM coverage under Pacific's automobile policy was governed by the terms of Hawai'i Revised Statutes (HRS) § 431:10C–301 (Supp.1992), which provides in relevant part:

**Required motor vehicle policy coverage.**

. . . .

(b) A motor vehicle insurance policy shall include:

. . . .

(3) With respect to any motor vehicle registered or principally garaged in this State, liability coverage ... for bodily injury or death ... for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury ... resulting therefrom; provided, however, that the coverage required under this paragraph shall not be applicable where any named insured in the policy shall reject the coverage in writing[.]

Thus, as the named insured under Pacific's automobile policy, pursuant to which Dines had opted and paid premiums for $250,000.00 of personal UM coverage, HRS § 431:10C–301(b)(3) obligated Pacific to indemnify Dines, inter alia, for any bodily injury that he sustained as a result of the conduct of the owner or operator of any uninsured motor vehicle from whom he was legally entitled to recover damages.

Put differently, and as a general proposition, UM statutes such as HRS § 431:10C–301(b)(3)

are considered to be remedial in nature[3] designed to afford maximum protection to

a state's residents, and to fill the gaps in compulsory insurance plans. Their purpose is to provide a remedy where injury is caused by an uninsured motorist; or, as has been more frequently stated, to provide a remedy to the innocent victims of irresponsible motorists who may have no resources to satisfy the damages they cause. This recourse [ ] is provided, then, to cover the situation of a wrongful or tortious act of an uninsured motorist or a hit and run driver, or that of another unknown motorist.

... Ideally, the purpose is to place those injured in the same position they would have occupied had the tortfeasor carried liability insurance....

8C Appleman, Insurance Law and Practice § 5067.45, at 41–46 (1981) (footnotes omitted) (quoted with approval in Dawes v. First Ins. Co. of Hawai'i, Ltd., 77 Hawai'i 117, 122–23, 883 P.2d 38, 43–44, reconsideration denied, 77 Hawai'i 489, 889 P.2d 66 (1994) (footnotes omitted) (brackets and ellipses in original)).

■ Being a remedial statute, HRS § 431:10C–301(b)(3) is "to be construed liberally in order to accomplish the purpose for which it was enacted.... [Remedial] statutes are liberally construed to suppress the [perceived] evil and advance the [enacted] remedy." Flores v. United Air Lines, Inc., 70 Haw. 1, 12, 757 P.2d 641, 647 (1988) (citations and internal quotation marks omitted) (brackets in original).

It is a cardinal principle of UM insurance that

"[a]n insured or an insured vehicle must be involved in the accident in order to collect under the UM endorsement." 12A J. Couch, Cyclopedia of Insurance Law § 45:634, at 127 (R. Anderson and M. Rhodes 2d ed. 1981) ... (emphasis added). This is because "[t]he uninsured motorist policy is personal to the insured[,]" Palisbo v. Hawaiian Ins. & Guar. Co. Ltd., 57 Haw. 10, 15, 547 P.2d 1350, 1354 (1976) (emphasis added), or, put differently, the

---

**3.** See Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd., 73 Haw. 385, 395–96, 834 P.2d 279, 285, reconsideration denied, 73 Haw. 625, 838 P.2d 860 (1992) (Hawai'i UM statute "was to be 'liberally construed to accomplish its remedial

purposes and give effect to the legislative intent.' ") (quoting Kau v. State Farm Mut. Auto. Ins. Co., 58 Haw. 49, 51, 564 P.2d 443, 444 (1977)) (emphasis added)).

UM coverage follows the insured's person. Accordingly,

> [t]he nature of uninsured motorist insurance is such that an insured is covered whether or not he or she is injured while in a vehicle which is insured under the policy.... [A]n insured under the ... policy ... [is] entitled to recover uninsured motorist insurance benefits ... even though she [is] injured while operating a vehicle not covered by the policy.

*Allstate Ins. Co. v. Morgan*, 59 Haw. 44, 47–48, 575 P.2d 477, 479–80 (1978)....

Construing a statute similar in all material respects to HRS § ... 431:10C–301(b)(3), the Connecticut Supreme Court aptly elaborated upon these general principles as follows:

> ... [R]equired *uninsured motorist coverage is "person oriented."* ... [T]he public policy embodied in [the UM statute] directs that uninsured motorist coverage be provided to insureds when they are not occupants of insured vehicles as well as when they are.
>
> Our uninsured motorist insurance statute ... provides coverage for *"persons* insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles...."* (Emphasis added.) *The coverage attaches to the insured person, not the insured vehicle.* Thus, ... an injured party may receive the benefits of a policy even though not occupying a vehicle insured under that policy....

> ....

> An insured's status at the time of the injury, whether passenger, pedestrian, or driver of an insured or uninsured vehicle, is irrelevant to recovery under the statutorily mandated coverage. *The coverage is portable: The insured and family members ... are insured no matter where they are injured. They are insured when injured in an owned vehicle named in the policy, in an owned vehicle not named in the policy, in an unowned vehicle, on a motorcycle, on a bicycle, whether afoot or on horseback or even on a pogo stick or in a rocking chair on [one's] front porch. Uninsured*

*motorist statutes* place no geographical limits on coverage and *do not purport to tie protection against uninsured motorists to occupancy of an insured vehicle. Uninsured motorist protection is coverage for persons, not for vehicles.*

*Harvey v. Travelers Indem. Co.*, 188 Conn. 245, 248, 250, 449 A.2d 157, 159–60 (1982) (citations and internal quotation marks omitted) (emphasis added).

*Dawes*, 77 Hawai'i at 123–24, 883 P.2d at 44–45 (emphasis added and some emphases deleted) (brackets in original).

 Consistent with the foregoing authority, the following propositions are established elements of this state's insurance law: (1) UM insurance coverage is personal to the named insured; (2) the public policy underlying HRS § 431:10C–301(b)(3) mandates that the insured vehicle (*i.e.,* the "covered auto" named in the policy) need not be involved in the accident in order for the named insured to be entitled to collect UM benefits; (3) UM coverage attaches to the named insured's person and not the insured vehicle; and, therefore, (4) a named insured, injured by an uninsured motorist from whom the named insured is legally entitled to recover damages, is entitled to UM coverage no matter where he or she is injured, whether the injury occurs while the named insured is (a) occupying an insured motor vehicle, (b) occupying an uninsured but owned motor vehicle, *Methven–Abreu v. Hawaiian Ins. & Guar. Co., Ltd.*, 73 Haw. 385, 394–96, 834 P.2d 279, 285–86, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992); *Kau v. State Farm Mut. Auto. Ins. Co.*, 58 Haw. 49, 51, 564 P.2d 443 (1977), (c) occupying an unowned motor vehicle, (d) on a motorcycle, (e) on a bicycle, (f) on horseback, (g) on a pogo stick, (h) on foot, or (i) in a rocking chair on a front porch.

### B. *Plain Language Of Pacific's Automobile Policy*

The insuring agreement of the UM coverage section of Pacific's automobile policy obligated Pacific to Dines as follows:

A. [Pacific] will pay compensatory damages which an **insured** is legally entitled to recover from the owner or operator of

an **uninsured motor vehicle** because of **bodily injury:**

1. Sustained by an insured; and

2. Caused by an accident.

The owner's or operator's liability for these damages must arise out of the ownership, maintenance or use of the **uninsured motor vehicle.**

. . . .

B. **Insured** as used in this Part means:

1. You and any **family member.**

2. Any other person **occupying your covered auto.**[4]

. . . .

C. **"Uninsured motor vehicle"** means a land motor vehicle . . . of any type:

. . . .

3. Which is a hit-and-run vehicle whose operator or owner cannot be identified and which hits: [5]

a. you or any **family member;**

b. a vehicle which you or any **family member** are **occupying;** or

c. **your covered auto.**

(Bold in original.)

"[Insurance] policies are subject to the general rules of contract construction; the terms of the policy should be interpreted according to their plain, ordinary, and accepted sense in common speech unless it appears from the policy that a different meaning is intended[.]" *Dawes*, 77 Hawai'i at 121, 883 P.2d at 42 (quoting *First Ins. Co. of Hawai'i, Inc. v. State*, 66 Haw. 413, 423, 665 P.2d 648, 655 (1983)). Moreover, "[insurance] policies are to be construed in accord with the reasonable expectations of a layperson." *Id.* (quoting *Sturla, Inc. v. Fireman's Fund Ins. Co.*, 67 Haw. 203, 209, 684 P.2d 960, 964 (1984)).

Nevertheless, as the voided portions of Pacific's automobile policy illustrate, *see supra* notes 4 and 5,

". . . the rule is that policies are to be governed by statutory requirements in force and effect at the time such policies are written. . . . Such provisions are read into each policy issued thereunder [ ] and become a part of the contract with full binding effect upon each party." *AIG Hawai'i Ins. Co., Inc. v. Estate of Caraang*, 74 Haw. 620, 633, 851 P.2d 321, 328 (1993) (citations and internal quotation marks omitted). Consequently, "[w]hen the terms of an insurance contract are in conflict with statutory language, the statute must take precedence over the terms of the contract." *Sol* [*v. AIG Hawai'i Ins. Co.*], 76 Hawai'i [304,] 307, 875 P.2d [921,] 924[, *reconsideration denied*, 76 Hawai'i 353, 877 P.2d 890 (1994).]

*Id.* at 121–22, 883 P.2d at 42–43 (footnote omitted); *see also Methven–Abreu*, 73 Haw. at 395–96, 834 P.2d at 285; *National Union Fire Ins. Co. v. Olson*, 69 Haw. 559, 563–64, 751 P.2d 666, 669 (1988); *Walton v. State Farm Mut. Auto. Ins. Co.*, 55 Haw. 326, 328, 518 P.2d 1399, 1400–01 (1974); *Columbia Casualty Co. v. Hoohuli*, 50 Haw. 212, 214–15, 437 P.2d 99, 102 (1968).

Thus, by the plain language of the insuring agreement of the UM coverage section of the automobile policy that it issued to Dines, Pacific obligated itself: (1) to pay compensatory damages; (2) sustained by an "insured"; (3) which the "insured" is legally entitled to recover from the owner or operator of an "uninsured motor vehicle"; (4) because of bodily injury; (5) caused by an accident; (6) arising out of the ownership, maintenance, or use of the "uninsured motor vehicle." Under the circumstances of this case, and as a

---

4. In *National Union Fire Insurance Co. v. Olson*, 69 Haw. 559, 751 P.2d 666 (1988), this court voided, as conflicting with the Hawai'i UM statutes, that portion of an automobile policy's "insuring agreement" regarding UM coverage that required that "covered persons" (*i.e.*, "insureds") other than the named insured and "family members" be "occupying [a] covered auto" (*i.e.*, be occupying an insured vehicle) at the time of injury. We further addressed this type of provision in *Dawes, supra.*

5. In *DeMello v. First Insurance Co. of Hawai'i, Ltd.*, 55 Haw. 519, 523 P.2d 304 (1974), this court struck down, as contrary to the protective purpose of the Hawai'i UM statutes and the public policy implicit therein, that portion of the policy's definition of an "uninsured motor vehicle" requiring that a "hit and run vehicle" actually "hit" (*i.e.*, make "physical contact" with) either a covered person, the vehicle that a covered person is occupying, or the covered auto (*i.e.*, the insured motor vehicle).

"layperson," there is little wonder that Dines rejected the UM coverage offered by Progressive Companies (Progressive) in connection with the motorcycle policy that it issued to Dines; after all, Dines *already* had $250,-000.00 of UM coverage under the automobile policy issued to him by Pacific, which followed his person and protected him no matter where he was injured.

### C. *HRS Ch. 431:10G Does Not Diminish Or Restrict An Insurer's Contractual Obligation To Accord A Named Insured Full UM Coverage Under An Automobile Policy Issued Pursuant To HRS § 431:10C–301(b).*

In *National Union Fire Insurance Co. v. Ragil,* 72 Haw. 205, 811 P.2d 473 (1991), this court stated the following in the context of underinsured motorist (UIM) insurance coverage: [6]

> [T]he Hawai['i] legislature drew a distinction between motorcycles and motor vehicles in enacting the no-fault insurance laws, Article 10C of HRS chapter 431[,]

entitled Motor Vehicle Insurance. The legislature exempted, with limited exceptions, motorcycles from the no-fault insurance laws and created a separate section on required insurance coverage for motorcycles. In doing so, the legislature did not require insurers to offer underinsured [or, for that matter, uninsured] coverage to motorcycle owners or operators in contrast to the requirement that it be offered to motor vehicle owners or operators.[7]

> . . . .

> [H]aving generally exempted motorcycle owners and operators from the provisions of Article 10C, the legislature chose to separately describe the required insurance coverage for motorcycles in Article 10C, Part V, entitled Motorcycles and Motor Scooters.[8] Part V does not require insurers to offer underinsured [or uninsured] coverage. . . .

(We note Part V relating to Motorcycle[s] and Motor Scooters was replaced in 1989 by Article 10G.[9] The distinction be-

---

**6.** In *Caberto v. National Union Fire Insurance Co.,* 77 Hawai'i 39, 881 P.2d 526 (1994), we recognized that the legislature intended that UM and UIM coverage should be treated identically "as a means of protection, through voluntary insurance, for persons who are injured by motorist[s] whose liability policies are inadequate to pay for personal injuries." *Id.* at 42, 881 P.2d at 529 (citing Hse.Conf.Comm.Rep. No. 126–88, in 1988 House Journal,. at 826, and Sen. Conf.Comm.Rep. No. 215, in 1988 Senate Journal, at 675).

**7.** HRS § 431:10C–103(8) (1987 Spec.Pamphlet) defines "motor vehicle" to mean "any vehicle of a type required to be registered under chapter 286 [*i.e.,* the Hawai'i Highway Safety Act], including a trailer attached to such a vehicle, but not including motorcycles and motor scooters."

**8.** HRS ch. 431:10C, Part V was repealed by the legislature in 1989. 1989 Haw.Sess.L.Act 208, § 6 at 419.

**9.** HRS ch. 431:10G, entitled "Motorcycle and Motor Scooter Insurance," is comprised of HRS §§ 431:10G–101 through –301. 1989 Haw.Sess. L.Act 208, § 1 at 413–17.
 HRS § 431:10G–102 (Supp.1992) provides:
 **Conditions of operation and registration of motorcycles and motor scooters.** No person shall drive a motorcycle or motor scooter upon any public street, road, or highway of this State at any time unless such motorcycle or motor scooter is insured at all times under a

liability policy as provided in section 431:10G–301.
 HRS § 431:10G–301 (Supp.1992) provides in relevant part:
 **Required motorcycle and motor scooter policy coverage.** (a) An insurance policy covering a motorcycle or motor scooter shall provide insurance to pay, on behalf of the owner or any operator of the insured motorcycle or motor scooter, sums which the owner or any operator may legally be obligated to pay for injury, death, or damage to the property of others, except property owned by, being transported by, or in the charge of the insured which arise out of the ownership, operation, maintenance, or use of the motorcycle or motor scooter:
 (1) Liability coverage . . . for all damages arising out of accidental harm sustained by any one person as a result of any one accident applicable to each person sustaining accidental harm; and
 (2) Liability coverage . . . for all damages arising out of injury to or destruction of property . . ., but not including property owned by, being transported by, or in the charge of the insured, as a result of any one accident.
 (b) At the option of the owner, each insurer shall:
 (1) Offer medical payment coverage . . . to pay all reasonable expenses incurred within one year from the date of accident for necessary medical, surgical, and dental services, and necessary ambulance, hospital, professional nursing, and funeral services;

tween underinsured [and uninsured] coverage for motor vehicles and motorcycles has remained intact.)

. . . .

The rationale behind this disparate treatment of motorcycles and motor vehicles is obvious. Motorcycle riders consent to an inherently more dangerous risk because they are less protected on the roadways than those in automobiles. This greater risk is reflected in the higher premiums they must pay for insurance.

*Id.* at 210, 213–15, 811 P.2d at 476–78 (footnote omitted).

Because it focused solely on the legislature's distinct statutory mechanisms for insuring "motor vehicles" (HRS ch. 431:10C) and motorcycles (HRS ch. 431:10G), the *Ragil* court missed the point regarding the right of an *automobile* policy's named insured to derive the benefits of the UM coverage that HRS § 431:10C–301(b)(3) mandates an automobile insurer to offer and for which the named insured has paid. In this connection, the *Ragil* court lost sight of two central rules of statutory construction. First, " '[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another.' " *Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 55, 868 P.2d 1193, 1202 (citing HRS § 1–16 (1985) and *Kam v. Noh,* 70 Haw. 321, 325, 770 P.2d 414, 417 (1989)), *reconsideration denied,* 76 Hawai'i 247, 871 P.2d 795 (1994). Second,

[s]tatutory language "must be read in the context of the entire statute and construed in a manner consistent with the purpose of the statutes." *Pacific Ins. Co. v. Oregon Auto. Ins. Co.,* 53 Haw. 208, 212, 490 P.2d 899, 902 (1971). . . . Moreover, [i]t is a cardinal rule of statutory construction that courts are bound, if ra-

tional and practicable, to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can legitimately be found which will give force to and preserve all the words of the statute.

*Camara v. Agsalud,* 67 Haw. 212, 215–16, 685 P.2d 794, 797 (1984) (citations omitted).

*Methven–Abreu,* 73 Haw. at 392–93, 834 P.2d at 284. *See also State v. Mezurashi,* 77 Hawai'i 94, 97, 881 P.2d 1240, 1243 (1994).

It is obviously a given that a motorcycle is not a "motor vehicle" within the meaning of HRS § 431:10C–103(8) (1987 Spec.Pamphlet) [10] and, therefore, cannot be a "covered auto" under an automobile policy issued pursuant HRS § 431:10C–301(b). Accordingly, a person seeking to insure his or her motorcycle must do so under a policy issued pursuant to HRS ch. 431:10G. Moreover, if a person lacks an insurable interest in a "motor vehicle," and has such an interest only in a motorcycle, the only possibility of obtaining UM coverage as a "named insured" arises if a motorcycle insurer, such as Progressive, is willing to offer it.

A named insured under an automobile policy issued pursuant to HRS § 431:10C–301(b), who happens to operate a motorcycle, is, however, in a very different position. As discussed above, UM coverage attaches to the named insured's *person* and not to any particular *vehicle*—"motor" or otherwise.[11] *See supra* at 327–328, 893 P.2d at 178–179. That being the case, a "covered auto" named in an automobile policy need not be involved in an accident in order for the injured named insured to be entitled to collect UM benefits. *Id.* Thus, such a named insured, injured by an uninsured motorist from whom the named insured is legally entitled to recover damages, is entitled to UM coverage no matter

(2) Offer an income disability plan; and
(3) Offer liability coverage in excess of the minimum coverages required by this section.

10. *See supra* note 7.

11. Pursuant to HRS § 431:10G–101 (Supp. 1992), " 'Motorcycle' has the meaning prescribed by section 286–2.' " HRS § 286–2 (1985) pro-

vides that " '[m]otorcycle' means every motor vehicle having a seat or saddle for use of the rider and designed to travel on not more than three wheels in contact with the ground, but excludes a farm tractor and a moped." Apparently, what is a "motor vehicle" for purposes of HRS ch. 286 is not a "motor vehicle" for purposes of HRS ch. 431:10C.

where he or she is injured, be it in an automobile or a rocking chair on a front porch, or on a motorcycle,[12] a bicycle, a horse, a pogo stick, or on foot. *Id.*

The dissent agrees with us "(1) that HRS § 431:10C–301(b)(3) (Supp.1992) governs the UM coverage under the Pacific automobile policy; (2) that this statute is remedial and '[should] be construed liberally in order to accomplish the purpose for which it was enacted'; and (3) that 'UM coverage follows the insured's person,' *i.e.*, the named insured." Dissenting opinion at 336, 893 P.2d at 187 (brackets in original). Accordingly, the dissent accurately characterizes the rationale underlying our analysis as the view (which the dissent deems "mistaken") "that the rule of liberal construction applied to HRS § 431:10C–301(b) means [that] UM benefits follow the person [of the named insured] no matter where he or she is injured, even if he or she is injured while operating a motorcycle." *Id.* at 343, 893 P.2d at 194. Nevertheless, the dissent accuses us of engaging in "judicial legislation" by "misapply[ing] the rule of liberal construction[,] thereby frustrating the legislature's intent." *Id.*

In our view, it is the dissent that is "mistaken" when it accuses us of "frustrating the legislature's intent" through "judicial legislation." Just as the dissent seeks to do, we are construing statutes. The fact is that reasonable minds can differ; our divergent interpretations merely underscore the complexity of the specific issue before us and the likelihood that the legislature never even considered it.

In the course of its exhaustive recitation of the evolution of HRS § 431:10C–301(b), the dissent selectively invokes various "fundamental tenets of statutory construction," dissenting opinion at 336, 893 P.2d at 187, to maintain the fiction that the legislature *intended* "not [to] extend motor vehicle UM coverage to an insured who is injured while operating a motorcycle." *Id.* at 343, 893 P.2d at 194. *Of course* "the first cardinal rule of statutory construction is that 'legislative enactments are presumptively valid and should be interpreted in such a manner as to give them effect.'" Dissenting opinion at 336, 893 P.2d at 187 (quoting *Richardson,* 76 Hawai'i

at 54, 868 P.2d at 1201). *Of course,* "[a]bsent any constitutional obstacles in applying the law, this court's function is 'to ascertain and give effect to the legislature's intention to the fullest degree.'" *Id.* at 336, 893 P.2d at 187 (quoting *Sol,* 76 Hawai'i at 307, 875 P.2d at 924). And *of course* "'[c]ourts ... must presume that [the legislature] meant what it said'" and "'[o]nly unmistakable support in the history and structure of the legislation can justify a rejection of otherwise unambiguous language.'" *Id.* (quoting *Richardson,* 76 Hawai'i at 57, 868 P.2d at 1204). None of these "fundamental tenets of statutory construction" favors the dissent's view of HRS § 431:10C–301(b) over ours.

■ But it is also true, although the dissent seems to forget it, that "[m]ore often than not, what passes for 'legislative intent' is no more than the ideas of a few individual legislators. Statements by legislators or even committee reports need not reflect the purpose which a majority of the legislators believed is carried out by [a] statute." *Yoshizaki v. Hilo Hospital,* 50 Haw. 150, 153 n. 5, 433 P.2d 220, 223 n. 5 (1967). *A fortiori,* legislative studies by nonmembers of the legislature do not have the probative value of committee reports or debates for purposes of establishing "legislative intent." *Twentieth Century Furniture, Inc. v. Labor and Indus. Relations Appeal Board,* 52 Haw. 577, 580, 482 P.2d 151, 152–53 (1971). Ultimately, therefore, "our duty in interpreting statutes is to give effect to the legislature's intent[,] which is obtained primarily from the language of the statute" itself. *Allstate Ins. Co. v. Hirose,* 77 Hawai'i 362, 364, 884 P.2d 1138, 1140 (1994).

The bottom line is that the dissent's assertion that "the majority's analysis ignores clear statutory language and legislative intent," dissenting opinion at 336, 893 P.2d at 187, is simply wrong. First, we have *not* "adopt[ed] a construction of HRS § 431:10C–301(b) that effectively renders [HRS ch. 431:10G] a nullity" by "seemingly limit[ing] article 10G to consumers whose only insurable interest is [in] a motorcycle or motor scooter." *Id.* at 342–343, 893 P.2d at 193–194. HRS ch. 431:10G obviously applies to

---

**12.** To the extent that *Ragil, supra,* suggests or holds to the contrary, it is overruled.

*all* named insureds under motorcycle and motor scooter insurance policies issued pursuant to the article, and nothing in this opinion suggests otherwise. The point is that HRS ch. 431:10G, by its plain language, does not limit the rights of HRS § 431:10C–301(b) named insureds to full UM coverage thereunder. *See supra* at 331, 893 P.2d at 182.

By the same token, we do *not* "completely disregard[ ] the distinct risk pools recognized by the legislature when it enacted a separate insurance rating system in HRS § 431:10G–201[,]" such that the legislature went to "the trouble of enacting a separate rating system for motorcycles and motor scooters to accomplish absolutely nothing." Dissenting opinion at 343, 893 P.2d at 194. Although the legislature *may* have failed fully to think through the complex interrelationship between HRS chs. 431:10C and 431:10G, it did not accomplish "absolutely nothing" by enacting them; motorcycle insurers, such as Progressive, receive the increased premiums to which they are entitled under HRS § 431:10G–201 (Supp.1992). But the fact remains that HRS 431:10G–201 applies only to motorcycle and motor scooter insurance, such as the policy issued by Progressive to Dines; it does not otherwise alter the requirements imposed upon motor vehicle insurance carriers pursuant to HRS § 431:10C–301(b).

Nothing in the legislative history underlying HRS ch. 431:10G indicates to the contrary. Hse.Stand.Comm.Rep. No. 1262, in 1989 House Journal, at 1306–07, merely states that HRS ch. 431:10G was being created "to contain provisions applicable to motorcycle and motor scooter insurance." Indeed, the report contemplated, *inter alia*, that Article 10G would "[p]rovide that tort liability is not abolished with respect to accidental harm incurred in or arising out of a motorcycle or motor scooter accident, and state the circumstances under which a cause of action in tort shall exist[.]" *Id.; see* HRS § 431:10G–105 (Supp.1992), the relevant text of which is set forth *infra* at note 16. At the very least, it is

clear that circumstances can exist under which an injured motorcyclist, who is a named insured under an automobile policy issued pursuant to HRS § 431:10C–301(b), can be legally entitled to recover damages against an uninsured tortfeasor. Sen. Stand.Comm.Rep. No. 790, in 1989 Senate Journal, at 1103, simply reiterates that the purpose of HRS ch. 431:10G "is to amend the laws of the State relating to motorcycle and motor scooter insurance."

The dissent cites the enactment of HRS § 431:10C–501 (1987 Spec.Pamphlet) for the erroneous proposition that "the legislature unambiguously exempted, with limited exceptions, motorcycles and motor scooters from [HRS ch. 431:]10C[,] including the provisions relating to UM coverage[.]" Dissenting opinion at 341, 893 P.2d at 192. HRS § 431:10C–501[13] provides in relevant part:

**Motorcycle or motor scooter excluded from article.** (a) All motorcycles and motor scooters required to be registered under chapter 286 shall be exempt from this article; provided that:

. . . .

(2) In the case of accidental harm *arising out of a motorcycle* or motor scooter *accident to any passenger of such motorcycle* or motor scooter, or any pedestrian, *motorcycles* and motor scooters *shall not be exempt* from section 431:10C–301 [*i.e.*, "[r]equired motor vehicle policy coverage"], section 431:10C–304 [*i.e.*, "[o]bligation to pay no-fault benefits"] and section 431:10C–306 [*i.e.*, "[a]bolition of tort liability"];

(3) In the case of accidental harm *arising out of an accident involving a motorcycle* or motor scooter *and a motor vehicle*, the owner or *operator of a motorcycle* or motor scooter *shall*

---

**13.** HRS § 431:10C–501 was identical in all material respects to its statutory forerunner, HRS § 294–12.6 (1985), which the dissent discusses at 339–340, 893 P.2d at 190–191, of the dissenting opinion. As the dissent concedes, "the provision governing UM coverage was not located in

[HRS] chapter 294 when the legislature enacted HRS § 294–12.6. In 1985, UM coverage was governed by HRS § 431–448 (1985). . . ." Dissenting opinion at 339 n. 2, 893 P.2d at 190 n. 2. Significantly, HRS § 431–448(a) contained no "motorcycle exemption" regarding UM coverage

*not be exempt* from section 431:10C–306.

(Emphasis added.)

The dissent's recitation of HRS § 431:10C–501 neither undermines the analysis contained in this opinion nor bolsters the dissent's position. First, as part of HRS ch. 431:10C, Part V, the section in question was repealed by the legislature in 1989, *see supra* note 8, has no counterpart in HRS ch. 431:10G, *see supra* note 9, and was not the law of this state at the time of Dines's accident.

Second, and more importantly, there is no tension between the provisions of HRS § 431:10C–501 and Dines's right to claim UM benefits under the automobile policy issued by Pacific and as to which he is the named insured. For present purposes, HRS § 431:10C–501(a)(2) merely stands for the proposition that an injured motorcycle passenger can derive the benefits of HRS §§ 431:10C–301 and –304, but must nevertheless meet the threshold requirements of HRS § 431:10C–306, when making a claim *against a motorcycle operator* as a result of a "motorcycle accident." *See* HRS § 431:10G–101 (Supp.1992) (defining "motorcycle accident" to mean "an accident arising out of the operation, maintenance, or use of a motorcycle, but *not involving a motor vehicle* ") (emphasis added)); *see also supra* note 7 (citing HRS § 431:10C–103(8) (1987 Spec.Pamphlet), which defines "motor vehicle," *inter alia,* to exclude motorcycles).

By the same token, and for present purposes, HRS § 431:10C–501(a)(3) merely stands for the proposition that an injured motorcycle operator must meet the threshold requirements of HRS § 431:10C–306 when making a claim *against the operator of an automobile* as a result of a "motor vehicle accident," *see* HRS § 431:10C–103(9) (1987 Spec. Pamphlet) and *infra* note 14, such as the one at issue in the present case. Significantly, however, section 501(a)(3) also conclusively establishes that circumstances can exist under which an injured motorcyclist, who is a named insured under an automobile policy issued pursuant to HRS § 431:10C–301(b), can be legally entitled to recover damages against an uninsured tortfeasor.

When all is said and done, the dissent points to no statutory language, legislative history, or anything else that expressly delineates *any* exception to, or limitation of, the scope of UM coverage accorded to a named insured under a motor vehicle insurance policy issued pursuant to HRS § 431:10C–301(b), which coverage follows the named insured's person *wherever* he or she may be injured. If the legislature wishes to limit such coverage, it can enact legislation that says so. In short, the dissent's attempt at refutation fails to justify its position that "the legislature ... did not extend motor vehicle UM coverage to an insured who is injured while operating a motorcycle." Dissenting opinion at 343, 893 P.2d at 194.

## IV. *DINES IS ENTITLED TO CLAIM UM BENEFITS UNDER PACIFIC'S AUTOMOBILE POLICY.*

■ In the present matter, Dines alleges that he lost control of his motorcycle and was forced off the roadway, thereby sustaining bodily injury and damages, when a driver of an unidentified automobile failed to yield the right of way at an intersection. It is undisputed that Dines was the named insured under an automobile policy issued by Pacific. As noted above, by the plain language of the insuring agreement of the UM coverage section of the policy, Pacific has obligated itself to pay such compensatory damages sustained by Dines, insofar as he is legally entitled to recover from the owner or operator of an uninsured vehicle because of bodily injury caused by an accident arising out of the ownership, maintenance, or use of the uninsured vehicle. *See supra* at 328, 893 P.2d at 179.

Assuming the truth, which Pacific is free to contest in the arbitration proceedings, of Dines's claim, he has suffered bodily injury and damages caused by an accident [14] arising

---

of named insureds under motor vehicle liability policies issued pursuant thereto.

14. HRS § 431:10C–103(1) (1987 Spec.Pamphlet) defines "accidental harm" to mean "bodily injury, death, sickness, or disease caused by a motor vehicle accident to a person." HRS § 431:10C–103(9) (1987 Spec.Pamphlet) defines "motor vehicle accident" in relevant part to mean "an accident arising out of the operation, maintenance, or use of a motor vehicle...."

out of the use of an uninsured vehicle.[15] Further assuming that the operator of the uninsured vehicle breached a duty to Dines that legally caused his injuries and damages and Dines can satisfy the prerequisites of HRS § 431:10G–105 (Supp.1992),[16] *see Methven–Abreu,* 73 Haw. at 398, 834 P.2d at 286–87, Dines would be legally entitled to recover from the operator of the uninsured vehicle. In accordance with the analysis set forth in sections III and IV of this opinion, it therefore follows, and we so hold as a matter of law, that Dines is entitled to claim UM benefits under Pacific's automobile policy.

## V. CONCLUSION

The arbitration agreement contained in Pacific's automobile policy entitled Dines, *in-*

*ter alia,* to arbitrate the question "[w]hether [he] is legally entitled to recover damages" and the amount thereof. Because Dines's claim is one "which on its face is governed by the [insurance] contract," it is "arbitrable under [the] agreement." *Koolau Radiology, Inc.,* 73 Haw. at 445, 448, 834 P.2d at 1300, 1302.

We reverse the circuit court's order denying Dines's petition to compel arbitration and remand this matter to the circuit court for the entry of an order granting Dines's petition.

RAMIL, Justice, dissenting, with whom MOON, Chief Justice, joins.

Because the majority's analysis ignores fundamental tenets of statutory construction

**15.** HRS § 431:10C–103(23)(B) (Supp.1992) defines "uninsured motor vehicle" in relevant part to mean "[a]n unidentified motor vehicle that causes an accident resulting in injury provided the accident is reported to the police or proper governmental authority, and claimant notifies the claimant's insurer within thirty days or as soon as practicable thereafter, that the claimant ... has a legal action arising out of the accident."

We note that, although it did not do so in the circuit court, Pacific contends on appeal that Dines failed to comply with the notice provisions of this subsection. Specifically, Pacific alleges that Dines's attorney notified it of the May 5, 1993 accident by certified letter dated June 3, 1993, but that "[t]he return receipt indicates that PACIFIC received the ... letter on June 7, 1993 or more than thirty (30) days after the accident." Answering brief at 1–2 (citing to 40–42 of the circuit court record). Pacific deems this state of affairs to be "in clear violation of [HRS § ] 431:10C–103(23)." *Id.* at 10.

Pacific's allegations on appeal do not necessarily establish *any* violation of HRS § 431:10C–103(23)(B). The issue need not be reached, however, because Pacific is either being disingenuous with this court or (if one is inclined toward the charitable view) is misconstruing the uncontroverted record. Pacific conceded in the circuit court, for purposes of its objection to Dines's petition, that: (1) Dines's accident occurred on May 5, 1993; (2) Dines reported the accident to the police within hours of its occurrence, and the police report reflected that the investigating police officer documented evidence of skid marks and point of impact at the scene; and (3) Pacific received Dines's notification letter (*i.e.,* Dines "reported the accident to Pacific") on June 4, 1993 (*i.e.,* on the thirtieth day following the accident).

Pages 40 through 42 of the circuit court record, to which Pacific refers in its answering brief and which are attached as Exhibit "C" to Dines's

petition to compel arbitration, consist of a certified letter dated *June 30,* 1993 from Dines's attorney to one of Pacific's adjustors, purporting to respond to a letter from the adjustor dated *June 14,* 1993. The accompanying "domestic return receipt" reflects that Pacific received the June 30, 1993 letter on *July 7,* 1993. Thus, Pacific's "born again" assertion on appeal that it did not receive notice of the accident until *June 7,* 1993 is utterly without support in the record.

**16.** HRS § 431:10G–105 provides in relevant part:

> **Tort liability.**
> . . . .
> (b) Any owner or operator of a motorcycle or motor scooter involved in a motor vehicle accident as defined in section 431:10C–103(9) and who incurs accidental harm as defined in section 431:10C–103(1), ... shall not have a cause of action in tort except in the following circumstances:
> . . . .
> > (2) Injury occurs to the owner or operator which consists, in whole or in part, in a significant permanent loss of use of a part or function of the body; or
> > (3) Injury occurs to the owner or operator which consists of a permanent and serious disfigurement which results in subjection of the owner or operator to mental or emotional suffering; or
> > (4) Injury occurs to the owner or operator in a motor vehicle accident in which the amount paid or accrued exceeds the medical-rehabilitative limit established in section 431:10C–308 for expenses provided in section 431:10C–103(10)(A) and (B); provided that the expenses paid shall be presumed to be reasonable and necessary in establishing the medical-rehabilitative limit.

and circumvents the clear legislative intent to generally exempt motorcycle operators from Hawai'i's motor vehicle no-fault laws, I respectfully dissent. For over a decade, since the time that Hawai'i first adopted a no-fault system, the legislature has wrestled with the issue of whether motorcycles and motor scooters should be exempted from Hawai'i's motor vehicle no-fault laws which encompass both required and optional insurance provisions, including uninsured motorist (UM) coverage. Finally, in 1985, the legislature chose to remove motorcycles and motor scooters from Hawai'i's motor vehicle no-fault laws and thereafter formulated a separate insurance rating system which is codified in Hawai'i Revised Statutes (HRS) article 431:10G (Supp.1992). However, today, the majority has effectively invalidated this legislative action as a result of which automobile insurers will now have to subsidize the higher personal injury claims of motorcyclists in the form of higher automobile insurance premiums.

## I. *RULES OF STATUTORY CONSTRUCTION*

As distinct from the legislative branch, the basic role of the judiciary is to interpret and apply the laws enacted by the legislature. Accordingly, in interpreting statutes, the first cardinal rule of statutory construction is that "legislative enactments are presumptively valid and should be interpreted in such a manner as to give them effect." *Richardson v. City and County of Honolulu*, 76 Hawai'i 46, 54, 868 P.2d 1193, 1201 (citation, internal quotation marks, and internal brackets omitted), *reconsideration denied*, 76 Hawai'i 247, 871 P.2d 795 (1994). Absent any constitutional obstacles in applying the law, this court's function is "to ascertain and give effect to the legislature's intention to the fullest degree." *Sol v. AIG Hawaii Ins. Co.*, 76 Hawai'i 304, 307, 875 P.2d 921, 924 (citation and internal quotation marks omitted), *reconsideration denied*, 76 Hawai'i 353, 877 P.2d 890 (1994). "Courts cannot amend statutes in the guise of interpreting them, and they

must presume that [the legislature] meant what it said.... Only unmistakable support in the history and structure of the legislation can justify a rejection of otherwise unambiguous language." *Richardson*, 76 Hawai'i at 57, 868 P.2d at 1204 (citation and internal quotation marks omitted).

In other words, when faced with a valid statute, this court is bound to interpret and apply the statute in a manner consistent with the purpose and policies determined by the legislature when it enacted that particular law. Accordingly, because the majority's analysis ignores clear statutory language and legislative intent to generally exempt motorcycle operators from Hawai'i's motor vehicle no-fault laws, I would affirm the circuit court's order denying Dines's petition to compel arbitration.

## II. *DISCUSSION*

The majority argues that "[t]he outcome of Dines's appeal turns on whether, under Hawai'i law, a named insured under an *automobile* liability insurance policy, who is injured by a hit-and-run driver,[1] can be entitled to UM benefits thereunder when the named insured is operating a *motorcycle* at the time of the accident." Majority opinion at 326, 893 P.2d at 177 (emphases in original). The majority correctly states: (1) that HRS § 431:10C–301(b)(3) (Supp.1992) governs the UM coverage under the Pacific automobile policy; (2) that this statute is remedial and "[should] be construed liberally in order to accomplish the purpose for which it was enacted"; and (3) that "UM coverage follows the insured's person," *i.e.*, the named insured. Majority opinion at 327–328, 893 P.2d at 178–179 (quoting *Flores v. United Air Lines, Inc.*, 70 Haw. 1, 12, 757 P.2d 641, 647 (1988) (internal quotation marks omitted) and *Dawes v. First Ins. Co. of Hawai'i, Ltd.*, 77 Hawai'i 117, 123, 883 P.2d 38, 44, *reconsideration denied*, 77 Hawai'i 489, 889 P.2d 66 (1994)).

However, relying primarily on HRS § 431:10C–301(b) and the above applicable legal principles, the majority erroneously concludes that Dines, a named insured under

---

**1.** Dines allegedly lost control of his motorcycle when a driver of an unidentified automobile

failed to yield the right-of-way at an intersection.

the automobile policy, is legally entitled to UM coverage no matter where he was injured, "whether injury occur[ed] while [Dines was] (a) occupying an insured motor vehicle, (b) occupying an uninsured but owned motor vehicle[,] (c) occupying an unowned motor vehicle, (d) *on a motorcycle,* (e) on a bicycle, (f) on horseback, (g) on a pogo stick, (h) on foot, or (i) in a rocking chair on a front porch." Majority opinion at 328, 893 P.2d at 179 (citations omitted) (emphasis added).

### A. *Limitation On The Rule Of Liberal Construction*

Although remedial statutes are to be construed liberally, this rule of liberal construction is not boundless and should not override other rules of statutory construction "where its application would defeat the intention of the legislature or the evident meaning of an act." Sutherland Statutory Construction § 60.01 (5th ed. 1992) (footnote omitted). Statutory construction dictates that an interpreting court should not fashion a construction of statutory text that effectively renders the statute a nullity or creates an absurd or unjust result. *Richardson,* 76 Hawai'i at 60, 868 P.2d at 1207. It goes without saying that a legislature does not go through the enactment process to accomplish absolutely nothing.

### B. *HRS Article 431:10G And Relevant Legislative History*

Here, HRS article 431:10G (Supp.1992), entitled Motorcycle and Motor Scooter Insurance, sets forth separate and distinct statutes applicable only to motorcycle and motor scooter insurance, including *inter alia,* its own provision for determining motorcycle and motor scooter insurance rates. In enacting article 10G, the legislature removed motorcycles and motor scooters from Hawai'i's motor vehicle no-fault laws, including the provisions governing UM coverage. However, ignoring the clear legislative intent behind this statute, the majority erroneously contends that nothing in HRS § 431:10G diminishes or restricts an insurer's contractual obligation to accord a named insured full UM coverage under an automobile policy pursuant to HRS § 431:10C–301(b). Majority opinion at 330, 893 P.2d at 181.

To fully understand the purpose underlying article 10G, we begin with a thorough historical examination of Hawai'i's motorcycle and motor scooter insurance provisions. Prior to the enactment of Hawai'i's motor vehicle no-fault laws in the early seventies, motorcyclists and motorcycle dealers opposed the inclusion of motorcycles in the motor vehicle no-fault laws citing the negative effect on the motorcycle premium rates as a justification for the exclusion. Additionally, they maintained that because other no-fault States excluded motorcycles, so should Hawai'i. Susan K. Claveria, *Motorcycles Under The Hawaii No–Fault Law* 1 (1984) (a report submitted to the legislature pursuant to House Resolution No. 391 adopted during the Regular Session of 1983). Despite this strong lobbying effort by motorcyclists and motorcycle dealers, the legislature included motorcycles under the scope of Hawai'i's motor vehicle no-fault laws. *Id.* However, because motorcycle insurance rates were subject to greater increases over the years, the movement for the exclusion of motorcycles was revived. *Id.*

#### 1.

In 1985, the state senate introduced Senate Bill No. 309 to "remove motorcycles and motor scooters from the requirements of Chapter 294" (hereafter also cited as Hawai'i's no-fault laws). Sen.Conf.Comm.Rep. No. 49, in 1985 Senate Journal, at 876. In Senate Conference Committee Report No. 49 (1985), the legislature commented:

This bill would allow persons to operate motorcycles and motor scooters on public streets without the necessity of obtaining and maintaining no-fault motor vehicle insurance. However, in order to afford protection to the general public from the negligent or reckless operation of motorcycles and motor scooters, the bill would require insurance coverage for bodily injury to others ... and property damage insurance....

In effect, *the bill would allow persons to operate motorcycles and motor scooters without insurance coverage for personal*

*injuries to themselves, or for their wage loss or medical expenses.* Further, an owner or operator of a motorcycle or motor scooter who is involved in an accident with an insured motor vehicle would not be able to collect no-fault benefits from the insurer of the insured motor vehicle.

Your Committee recognizes the problem faced by owners and operators of motorcycles and motor scooters with respect to high no-fault insurance premium rates. This bill is intended to afford some measure of relief to such persons.

*Id.* (emphasis added). *See* Hse. Conf.Comm.Rep. No. 49, in 1985 House Journal, at 925.

· Motorcyclists and motorcycle dealers lobbied strongly for the passage of this bill. They cited that the inclusion of motorcycles in Hawai'i's motor vehicle no-fault program resulted in, *inter alia,* the marked increase in motorcycle insurance premiums, a shrinking market for motorcycle insurance, motorcycles being priced out of the reach of most consumers, and a growing number of persons operating motorcycles with no insurance coverage at all. *See Senate Committee on Consumer Protection on Senate Bill 309,* 13th State Legis., Regular Session (1985) (testimony of Leroy Hensley of Street Bikers United; Al Montgomery, President of Montgomery Motors, Ltd.; and John Connolly, Vice President of Yamaha of Hawaii).

In testimony supporting Senate Bill No. 309, the Hawaii Business League summarized problems associated with including motorcycles in Hawai'i's motor vehicle no-fault system. Citing to a Hawai'i no-fault study, entitled *Review Of The Hawaii No Fault Law,* the Hawaii Business League stated:

[W]e believe the study ... by Tillinghast entitled, "[Review Of The Hawaii No Fault Law]" points out that the no fault insurance system has worked against motorcycles. *They are actually being discriminated against. According to the report, the insurance rates for property damage coverage has [sic] increased more than personal injury coverage. This by itself is discriminatory to motorcycle riders inasmuch as their property damage is general-*

*ly much smaller, however they do have higher personal injury claims.*

The consultant also notes that in 1981, they cautioned that open competition in Hawaii's automotive insurance industry could have the potential of losing it's [sic] effectiveness towards the regulations of rates for "particular market segments where carriers are not interested in actively writing business." Unfortunately, this is the case with carriers and the motorcycle industry, although there is a "take all comers" provision. Recent surveys by motorcycle dealers have revealed that very few of the carriers will provide quotes or at least realistic quotes.

We find [bill 309] desirable, inasmuch as the consultant points out that our current no fault law contains a provision that reimburses the insurer of a light weight vehicle when it collides with a heavier vehicle. This clause would apply to motorcycles. Amazingly enough we find that only $250,-000 per year is paid for these kinds of cases. It would appear then that the *majority of accidents incurred by motorcycles are single motorcycle accidents and, therefore, we are not dealing with the same type of situation for which no fault was enacted. If the individual is going to have an accident and it is a single vehicle accident, they should be provided with this option, since it affects no one but themselves.*

*Senate Committee on Consumer Protection on Senate Bill 309,* 13th State Legis., Regular Session (1985) (testimony of Tim Lyons, Executive Vice President of The Hawaii Business League) (emphases added). *See Review Of The Hawaii No Fault Law* 12–16, 24–25 (1985).

In addition, the House heard testimony of those expressing the concerns with Senate Bill No. 309 regarding the following: (1) maintaining the threshold amount under no-fault insurance for operators of motor vehicles, as well as for operators of motorcycles and motor scooters; (2) preventing operators of motorcycles or motor scooters from submitting claims under any no-fault policy when said operator is involved in an accident; (3) precluding owners or operators of motorcycles and motor

scooters from claiming no-fault benefits as pedestrians, or under the assigned claims program of the Hawaii Joint Underwriting Plain; and (4) *maintaining the consistency of Chapter 294, Hawaii Revised Statutes, by completely deleting all reference to motorcycles and motor scooters.*

Hse.Stand.Comm.Rep. No. 908, in 1985 House Journal, at 1441 (emphasis added). Responding to these concerns, but recognizing that the purpose of the bill was to "remove motorcycles and motor scooter owners from [Hawai'i's motor vehicle no-fault laws]," the House amended bill No. 309 by, *inter alia:* (1) including a provision stating that "the owner or operator of a motorcycle or motor scooter will not be exempt from Section 294–6" which sets the threshold amount for tort liability for operators of motorcycles and motor scooters; (2) precluding an owner or operator of a motorcycle or motor scooter from receiving no-fault benefits as a pedestrian; (3) precluding the operator of a motorcycle or motor scooter from receiving any benefits under any no-fault policy; and (4) deleting other provisions to exclude motorcycles and motor scooters from Hawai'i's motor vehicle no-fault laws. *Id.*

Meanwhile, the Senate was concerned with: (1) keeping no-fault coverage intact in cases where a motorcycle rider strikes a pedestrian, or a passenger is injured; (2) continuing coverage for property damage and personal injury liability for pedestrians and riders as in no-fault; and (3) maintaining the threshold amount, under no-fault insurance, for those pedestrians or passengers injured by a motorcycle rider. Sen. Stand.Comm.Rep. No. 688, in 1985 House Journal, at 1181. Also recognizing that "the purpose of the bill was to remove motorcycle and motor scooter operators from [Hawai'i's motor vehicle no-fault laws]," the Senate amended the bill by, *inter alia,* adding the following provision: "in case of accidental harm arising out of a motorcycle or motor

scooter accident to any passenger of said motorcycle or motor scooter, or any pedestrian, motorcycles and motor scooters will not be exempt from sections 294–4, 294–6, and 294–10, Hawaii Revised Statutes." *Id.*

Pondering over the long debated issue regarding the inclusion of motorcycles and motor scooters in Hawai'i's motor vehicle no-fault laws and weighing the concerns of all parties involved, the legislature amended the no-fault laws and enacted HRS § 294–12.6 (1985) which states in relevant part:

**Motorcycles and motor scooters excluded from chapter.**

(a) All motorcycles and motor scooters required to be registered under this chapter 286 [Highway Safety] shall be exempt from chapter 294 [Hawai'i's motor vehicle no-fault laws]; provided that:

(1) No person shall drive a motorcycle or motor scooter upon any public street, road, or highway of this State at any time unless such vehicle is insured at all times under a liability insurance policy as provided in this section [294–12.6(b)].

(2) In the case of accidental harm arising out of a motorcycle or motor scooter accident to any passenger of said motorcycle or motor scooter, or any pedestrian, motorcycles and motor scooters *will not be exempt* from sections 294–4, 294–6, and 294–10; and

(3) In the case of accidental harm arising out of an accident involving a motorcycle or motor scooter and a motor vehicle, the owner or operator of a motorcycle or motor scooter *will not be exempt* from section 294–6. . . .

(Emphases added.) Based on the foregoing legislative history and the plain language of HRS § 294–12.6, the legislature clearly intended to remove motorcycles and motor scooters completely from Hawai'i's motor vehicle no-fault laws, except in limited circumstances specifically set forth in § 294–12.6.[2]

---

**2.** Although UM coverage is generally considered part of Hawai'i's motor vehicle no-fault laws, the provision governing UM coverage was not located in chapter 294 when the legislature enacted HRS § 294–12.6. In 1985, UM coverage was governed by HRS § 431–448 (1985), which provided in relevant part:

**Automobile liability; coverage for damage by uninsured or underinsured motor vehicle.** (a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor

## 2.

In 1987, the State Insurance Commissioner proposed to recodify all statutes relating to insurance into one chapter of HRS to be known and cited to as the "Insurance Code." *See* Sen.Stand.Comm.Rep. No. 848, in 1987 Senate Journal, at 1254. The legislature responded to this proposal by enacting Act 347 of 1987 that repealed many chapters in HRS and consolidated them under HRS chapter 431. 1987 Haw.Sess.L.Act 347.

In recodifying the insurance statutes, the legislature "declare[d] that the purpose of this chapter is to recodify, *without substantive change,* the insurance law in effect immediately prior to [July 1, 1988,] the effective date of this chapter." HRS § 431:1–100.5 (1987 Spec.Pamphlet) (emphasis added).

Hawai'i's no-fault laws, codified in Chapter 294, were among the repealed chapters. However, the legislature recodified these laws in article 10C of the Insurance Code, known and cited as "Hawaii Motor Vehicle Insurance Law." HRS § 431:10C–101 (1987 Spec.Pamphlet). In addition, the legislature combined the motor vehicle no-fault laws codified in chapter 294 (1985) with other no-fault laws such as the UM coverage provisions codified in HRS § 431–448 (1985) into one article, HRS article 10C. *See* HRS § 431:10–301 (1987 Spec.Pamphlet).

However, instead of codifying the exemption of motorcycles and motor scooters from Hawai'i's motor vehicle no-fault laws in one statute as in HRS § 294–12.6, the legislature chose to set forth a separate part governing only motorcycles and motor scooters in article 10C, part V, entitled Motorcycles and Motor Scooters. Like chapter 294, article 10C, part V, also sets forth a specific provision removing motorcycles and motor scooters, with limited exceptions, from Hawai'i's

motor vehicle no-fault laws. HRS § 431:10C–501 states in relevant part:

**Motorcycles and motor scooters excluded from article.**

(a) All motorcycles and motor scooters required to be registered under chapter 286 [Highway Safety] shall be exempt from this article [Hawai'i's motor vehicle no-fault laws]; provided that:

(1) No person shall drive a motorcycle or motor scooter upon any public street, road or highway of this State at any time unless such vehicle is insured at all times under a liability insurance policy as provided in section 431:10C–503; and

(2) In the case of accidental harm arising out of a motorcycle or motor scooter accident to any passenger of such motorcycle or motor scooter, or any pedestrian, motorcycles and motor scooters *shall not be exempt* from section 431:10C–301, section 431:10C–304, and section 431:10C–306;

(3) In the case of accidental harm arising out of an accident involving a motorcycle or motor scooter and a motor vehicle, the owner or operator of a motorcycle or motor scooter *shall not be exempt* from section 431:10C–306.

(Emphases added.) In light of the plain language of this statute and its relevant legislative history, the repeal of chapter 294, specifically HRS § 294–12.6, had absolutely no effect in altering or modifying the legislature's decision to remove motorcycles and motor scooters from Hawai'i's no-fault laws. Most importantly, by enacting HRS § 431:10C–501, the legislature unambiguously exempted, with limited exceptions, motorcycles and motor scooters from article 10C including the provisions relating to UM coverage; and therefore, "[this court] must pre-

---

vehicle, shall be delivered, issued for delivery, or renewed in this State, with respect to any motor vehicle registered or principally garaged in this State, unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in section 287–7, under provisions filed with and approved by the insurance commissioner, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness, or disease, including

death, resulting therefrom, provided that the coverage required under this section shall not apply where any insured named in the policy shall reject the coverage in writing.

UM provisions were not incorporated with the other no-fault laws codified in chapter 294 until 1977. In 1977, the legislature recodified all statutes relating to insurance into one chapter and incorporated the no-fault laws in chapter 294 and provisions relating to UM coverage into one article, HRS article 10C. *See* HRS § 431:10–301 (1987 Spec.Pamphlet).

sume that [the legislature] meant what it said...." *Richardson,* 76 Hawai'i at 57, 868 P.2d at 1204 (citation and internal quotation marks omitted).

### 3.

In 1989, the legislature repealed HRS article 10C, part V, and recodified the motorcycle and motor scooter insurance provisions in HRS article 10G, entitled Motorcycle And Motor Scooter Insurance. The legislature expressed that the purpose of enacting article 10G was to "clarify the laws regulating motorcycle and motor scooter insurance" and essentially "protect the rights of operators and insurers alike." Sen.Stand.Comm.Rep. No. 790, in 1989 Senate Journal, at 1103. *See* Hse.Stand.Comm.Rep. No. 1262, in 1989 House Journal, at 1306–07 (stating article 10G would "[c]larify the general inapplicability of the no-fault law to motorcycles and motor scooters").

Because the legislature had already chosen to exempt motorcycles and motor scooters from Hawai'i's motor vehicle no-fault laws which includes UM coverage and because article 10G only intended to clarify this policy decision, the legislature was not obligated to enact superfluous language to explain that, except as otherwise provided, Hawai'i's no-fault laws as codified in article 10C were inapplicable to motorcycles and motor scooters. The general inapplicability of 10C, *i.e.,* Hawai'i's motor vehicle no-fault laws, to motorcycles and motor scooters is self-evident in light of the fact that the legislature went out of its way to enact a new statutory scheme, *i.e.,* article 10G, for motorcycle and motor scooter insurance. Just as articles 10A (Accident And Sickness Insurance Contracts), 10B (Credit Life Insurance and Credit Disability Insurance), 10D (Life Insurance And Annuities), 10E (Property Insurance), and 10F (Surety Insurance) are generally inapplicable to article 10C (Motor Vehicle Insurance), article 10C is also inapplicable to article 10G (Motorcycle And Motor Scooter Insurance), except to the extent specifically provided.

In addition to going out of its way to enact a special article for motorcycles and motor scooters, the legislature went through the complex and intricate process of developing a separate insurance rating system for motorcycles and motor scooters. *See* HRS § 431:10G–201 (Supp.1992). Rate-making based on groups with similar risks is a fundamental method that insurance companies utilize to fairly and effectively spread the costs of the risk among those with similar risks.[3] Indeed, in adopting a separate rating system, the legislature recognized that motorcycles and motor scooters pose risks distinct from their automotive counterparts. First, motorcycle accidents generally result in much smaller property damage; however, they do have higher personal injury claims because they are less protected on roadways. *See Senate Committee on Consumer Protection on Senate Bill 309,* 13th State Legis., Regular Session (1985) (testimony of Tim Lyons, Executive Vice President of The Hawaii Business League). Second, the majority of accidents appear to be single vehicle accidents and, consequently, are not the same

---

**3.** According to Professor William R. Vance of the Yale Law School,

> The general purpose of the business of insurance is then to distribute, as directly and effectively as possible, the risks of loss from any of the innumerable perils that beset the person who is active under the conditions of modern life among a large number of those who are exposed to similar perils. Thus, for example, by the operation of a vast number of insurance contracts made with numerous insurance companies, most losses suffered in connection with maritime ventures because of perils of the sea are directly distributed among the marine adventurers who are insured. The premium paid by the adventurer measures his distributive share of the risk. The cost of this distributive risk-bearing, that is, the insurance premium, is added to the cost of carrying on the business incurred, and, by a process of price adjustment, in ever widening circles indirectly distributed through the community. The direct and immediate benefit to the individual is his ability to calculate the burden of his risk. If his venture escapes the perils to which it is exposed, he must nevertheless bear his share, in the form of a premium payment, of losses suffered by his less fortunate fellows. If he himself is unfortunate, his loss is made up to him from the contributions of others, and the burden of his risk-bearing remains still limited to his distributive share measured by the premiums paid.

William R. Vance, Handbook on the Law of Insurance 4 (3d ed. 1951).

type of situations, *i.e.*, two vehicle accidents, for which no-fault was generally enacted to insure. *See id.*

In light of the abundant amount of history evidencing the legislative intent to remove motorcycles and motor scooters from Hawai'i's motor vehicle no-fault laws, the majority's comment seems untenable when it asserts that nothing in HRS § 431:10G diminishes or restricts an insurer's contractual obligation to accord a named insured full UM coverage under an automobile policy pursuant to HRS § 431:10C–301(b). Majority opinion at 330, 893 P.2d at 181. The legislative history clearly indicates that Hawai'i's motor vehicle no-fault laws which include provision for UM coverage does not cover accidental injuries suffered by persons operating a motorcycle or motor scooter. Although the legislature repealed HRS § 294–12.6 in 1985 and repealed HRS § 431:10C–501 in 1989, the legislative intent to generally exempt motorcycles and motor scooters from Hawai'i's motor vehicle no-fault laws survives today in HRS chapter 431:10G.

### C. *Overruling Ragil Was Wrong.*

The majority overrules *National Union Fire Insurance Co. v. Ragil,* 72 Haw. 205, 811 P.2d 473 (1991). The majority argues that by focusing solely on distinct statutory mechanisms for insuring motor vehicles and motorcycles, the *Ragil* court lost sight of two central rules of statutory construction: (1) laws *in pari materia* shall be construed with reference to each other; and (2) statutory language must be read in the context of the entire statute and construed in a manner consistent with the purpose of the statutes. Majority opinion at 331, 893 P.2d at 182 (citing *Richardson,* 76 Hawai'i at 55, 868 P.2d at 1202 and *Methven–Abreu v. Hawaiian Ins. & Guar. Co.,* 73 Haw. 385, 392–93, 834 P.2d 279, 284, *reconsideration denied,* 73 Haw. 625, 838 P.2d 860 (1992)). Moreover, the majority states that:

> [i]t is a cardinal rule of statutory construction that courts are bound, if rational and practicable, to give effect to all parts of a statute[, a fortiori an article,] and no clause, sentence, or word shall be construed as *superfluous, void, or insignificant* if construction can legitimately be found which will give force to and preserve all the words of the statute.

Majority opinion at 331, 893 P.2d at 182 (quoting *Methven–Abreu,* 73 Haw. at 392–93, 834 P.2d at 284 (citation omitted)) (emphasis added).

However, despite their awareness of this cardinal rule, the majority completely disregards it and adopts a construction of HRS § 431:10C–301(b) that effectively renders article 10G a nullity. For example, the majority states that a person with an insurable interest in only a motorcycle is in a "very different position" from a named insured under an automobile policy pursuant to HRS § 431:10C–301(b), who happens to operate a motorcycle. Majority opinion at 331, 893 P.2d at 182. The majority suggests on one hand that a person with only an insurable interest in a motorcycle could only obtain UM coverage through a motorcycle insurance policy issued pursuant to HRS ch. 431:10G. *Id.* On the other hand, the majority argues that a named insured under an automobile policy could obtain similar UM coverage through his or her automobile insurance because UM coverage follows the person. *Id.*

This line of argument renders article 10G insignificant because it seemingly limits article 10G to consumers whose only insurable interest is a motorcycle or motor scooter. Because most motorcyclists also own a motor vehicle, the majority would seem to imply that the legislature went out of its way to enact a special article for motorcycle and motor scooter insurance and a separate rating system for only a small handful of consumers whose only insurable interest is a motorcycle. *See* Susan K. Claveria, *Motorcycles Under The Hawaii No–Fault Law* 12 (1984) (stating that of registered motorcyclist who responded to her survey, 84.3% reported owning a motor vehicle with four or more wheels).

Contrary to the majority opinion, the court in *Ragil* was absolutely correct when it concluded that the legislature drew a distinction between motorcycles and motor vehicles and, therefore, exempted motorcycles, with limited exceptions, from Hawai'i's motor vehicle no-fault laws. *Ragil,* 72 Haw. at 210, 811 P.2d at 476. The *Ragil* court stated that:

The rationale behind this disparate treatment of motorcycles and motor vehicles is obvious. Motorcycle riders consent to an inherently more dangerous risk because they are less protected on the roadways than those in automobiles. This greater risk is reflected in the higher premiums they must pay for insurance.

*Id.* at 215, 811 P.2d at 478.

The majority's analysis completely disregards the distinct risk pools recognized by the legislature when it enacted a separate insurance rating system in HRS § 431:10G–201. *See supra* at 331–332, 893 P.2d at 182–183. Under the majority's analysis, automobile insurers whose risks are distinct from a motorcyclist will now have to subsidize the higher personal injury claims of motorcyclists in the form of higher automobile insurance premiums.

Based on the foregoing, it is apparent that the legislature did not go through the trouble of enacting a separate rating system for motorcycles and motor scooters to accomplish absolutely nothing. Therefore, contrary to the majority opinion, it is the majority, not the court in *Ragil,* who has lost sight of the rules of statutory construction. Majority opinion at 331, 893 P.2d at 182.

### D. *The Majority Misapplies The Rule Of Liberal Construction.*

The majority's position is evidently based on the mistaken belief that the rule of liberal construction applied to HRS § 431:10C–301(b) means UM benefits follow the person no matter where he or she is injured, even if he or she is injured while operating a motorcycle.

However, as stated *supra* at 337, 893 P.2d at 188, the rule of liberal construction is not boundless and should not override other rules of statutory construction "where its application would defeat the intention of the legislature or the evident meaning of an act." Sutherland Statutory Construction § 60.01 (5th ed. 1992) (footnote omitted).

The majority misapplies the rule of liberal construction thereby frustrating the legislature's intent. Therefore, because the majority erroneously concludes that UM coverage follows a person while operating a motorcycle or motor scooter that is directly contrary to legislative intent, the majority's opinion today amounts to no more than judicial legislation.

## III. *CONCLUSION*

Accordingly, because the legislature intended to exempt motorcycles from Hawai'i's motor vehicle no-fault laws, this court should hold that the legislature likewise did not extend motor vehicle UM coverage to an insured who is injured while operating a motorcycle. Thus, because Hawai'i's motor vehicle no-fault laws clearly exclude UM coverage from motorcycles, I would affirm the circuit court's order denying Dines's petition to compel arbitration.