62 P.3d 189

UNITED PUBLIC WORKERS, AFSCME, LOCAL 646, AFL–CIO; Hawai'i Government Employees Association, AFSCME, Local 152, AFL–CIO; Hawai'i State Teachers Association; and Hawai'i Fire Fighters Association, Local 1463, International Association of Fire Fighters, AFL–CIO, Plaintiffs–Appellees/Cross–Appellants,

v.

Davis YOGI, Chief Negotiator, State of Hawai'i; Benjamin Cayetano, Governor, State of Hawai'i; The Board of Education; Maryanne Kusaka, Mayor, County of Kaua'i; Stephen Yamashiro, Mayor, County of Hawai'i, Defendants–Appellants/Cross–Appellees,

and

Jeremy Harris, Mayor, City and County of Honolulu; James Apana, Mayor, County of Maui; and The Board of Regents of The University of Hawai'i, Defendants/Cross–Appellees.

No. 23705.

Supreme Court of Hawai'i.

Dec. 6, 2002.

Herbert R. Takahashi (Rebecca L. Covert, Honolulu, with him on the briefs), of Takahashi, Masui & Vasconcellos, for plaintiffs-appellees/cross-appellants.

Gary Hynds, Deputy Attorney General, (Kathleen A. Watanabe, with him on the briefs), for defendants-appellants/cross-appellees Davis Yogi, Benjamin Cayetano, and The Board of Education.

Ted H.S. Hong, Deputy Corporation Counsel, (Margaret Hanson, with him on the briefs) for defendants-appellants/cross-appellees Stephen Yamashiro and Maryanne Kusaka.

Steven Christensen, Deputy Corporation Counsel, on the brief, for defendant-appellant/cross-appellee Stephen Yamashiro.

Opinion by RAMIL, J., in which ACOBA, J. Joins, Announcing the Decision of the Court.

Defendants-appellants/cross-appellees Davis Yogi, Chief Negotiator, State of Hawai'i; Benjamin Cayetano, Governor, State of Hawai'i; The Board of Education; Maryanne Kusaka, Mayor, County of Kauai; Stephen Yamashiro, Mayor County of Hawai'i; Jeremy Harris, Mayor, City and County of Honolulu; James Apana, Mayor, County of Maui; and the Board of Regents of the University of Hawai'i [hereinafter, collectively, Defendants],[1] appeal from the August 4, 2000 judgment and order of the first circuit court[2] in favor of plaintiffs-appellees/cross-appellants public employee unions [hereinafter, collectively, Plaintiffs].[3] The judgment and order declared unconstitutional Section 2 of Act 100, *see* 1999 Haw. Sess. L. Act 100, § 2, at 368–69, which prohibits public employers and public employee unions from collectively bargaining over cost items for the biennium 1999 to 2001 and permanently enjoined Defendants from enforcing it. Plaintiffs cross-appeal from those portions of the court's order dismissing their alternative grounds for relief.[4]

The main issue before us is whether Section 2 violates article XIII, section 2 of our state constitution.[5] We hold that it does. Accordingly, we focus our analysis on Plaintiffs' collective bargaining rights. We affirm.

## I. BACKGROUND

During the 1999 legislative session, the Hawai'i State Legislature enacted Act 100. *See* 1999 Haw. Sess. L. Act 100, at 368–70. Section 2 of Act 100 amended Hawai'i Revised Statutes ("HRS") § 89–9(a) by adding the language underscored:

### § 89–9  Scope of negotiations.

[Section effective until June 30, 2002 .... ](a) The employer and the exclusive representative shall meet at reasonable times, including meetings in advance of the employer's budget-making process, and shall negotiate in good faith with respect to wages, hours, the number of incremental

1. All of the above persons were defendants at the trial level. Defendants Jeremy Harris and the Board of Regents of the University of Hawai'i did not appeal the judgment but have responded to the plaintiffs' cross-appeal and so are actually defendants/cross-appellees.

2. The Honorable Virginia Lea Crandall presided over this case.

3. The plaintiffs in this case include United Public Workers, AFSCME, Local 646, AFL–CIO; Hawai'i Government Employees Association, AFSCME, Local 152, AFL–CIO; Hawai'i State Teachers Association; and Hawai'i Fire Fighters Association, Local 1463, International Association of Fire Fighters, AFL–CIO.

4. Plaintiffs cross-appeal the circuit court's order on the following grounds:
   (1) The court erred by excluding the entire testimony of Bender, a linguistic expert, on the meaning and significance of key constitutional terms and phrases.
   (2) The court erred in concluding that the employees' right under article XIII of the constitution is not a "fundamental right."
   (3) The court erred in concluding that enforcement of Section 2 did not violate the equal protection clause under article I, section 5 of the constitution.
   (4) The court erred in concluding that Section 2 did not violate the doctrine of separation of powers.

(5) The court erred in concluding that Section 2 did not violate article III, section 14 of the constitution which mandates that "[e]ach law shall embrace but one subject."

Because we hold that Section 2 of Act 100 violates the rights of public employees under article XIII, section 2 of the Hawai'i Constitution, we need not address Plaintiffs' cross-appeal claims.

5. Article XIII, section 2 [formerly article XII, section 2] provides that "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law." Prior to the 1968 amendment, article XII, section 2 provided that "[p]ersons in public employment shall have the right to organize and to present their grievances and proposals to the State, or any political subdivision or any department or agency thereof." *Proceedings of the Constitutional Convention of Hawai'i of 1968*, at 476 (1972) [hereinafter 1 *Proceedings 1968* ]. Article XII, section 2 was amended in 1968 to read, "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining as prescribed by law." *Id.* at 207. Ten years later, at the 1978 Constitutional Convention, article XII, section 2 was renumbered to article XIII, section 2, and the phrase, "as prescribed by law" was replaced with the phrase as "provided by law." *Proceedings of the Constitutional Convention of Hawai'i of 1978*, at 743 (1980) [hereinafter 1 *Proceedings 1978* ].

and longevity steps and movement between steps within the salary range, the amounts of contributions by the State and respective counties to the Hawai'i public employees health fund to the extent allowed in subsection (e), and other terms and conditions of employment which are subject to negotiations under this chapter and which are to be embodied in a written agreement, or any question arising thereunder, but such obligation does not compel either party to agree to a proposal or make a concession; provided that the parties may not negotiate with respect to cost items as defined by section 89–2 for the biennium 1999 to 2001, and the cost items of employees in bargaining units under section 89–6 in effect on June 30, 1999, shall remain in effect until July 1, 2001.

HRS § 89–9(a) (2001) (underscoring added). "Cost items" include "wages, hours, amounts of contributions by the State and Counties to the Hawai'i public employees health fund, and other terms and conditions of employment, the implementation of which requires an appropriation by a legislative body."

**6.** In pertinent part, the trial court's conclusions of law stated as follows:

8. *With respect to Article XIII, Section 2, of the Hawai'i State Constitution, the phrase "as provided by law" does not provide the legislature with unfettered discretion* to enact law which take away all issues from the process of collective bargaining

9. Such a construction that the legislature has unlimited discretion would produce an absurd result inconsistent with the purpose of Article XIII, Section 2, Hawai'i State Constitution. *See* [ ] *In [r]e Application of Pioneer Mill Co.,* 53 Haw. 496, 500 [, 497 P.2d 549, 552] (1972).

10. The legislature has wide authority to set the parameters for collective bargaining and has constitutionally exercised such legislative discretion and authority on previous occasions, for example; establishing the bargaining units (§ 89–6), specifying matters that are not subject to collective bargaining such as Health Fund Benefits (§ 89–9(d)), determining the expiration date for collective bargaining agreements and proscribing reopener of cost items during the agreement (89–10(c)).

11. The legislature has the authority and discretion to decide whether to fund collective bargaining agreements or arbitration awards. §§ 89–10(b) and 89–11(d), HRS.

12. *While the legislature has broad authority to structure the collective bargaining process, it may not infringe on the "core principles of*

HRS § 89–2 (1993). In essence, Section 2 of Act 100 prohibited public employers and public employees' unions from collectively bargaining over cost items for the biennium 1999 to 2001.

On October 11, 1999, Plaintiffs filed a complaint against Defendants, alleging, *inter alia,* that, Section 2 violated their "right to organize for the purpose of collective bargaining" as provided by article XIII, section 2 of the Hawai'i Constitution. The complaint sought injunctive and declaratory relief.

A non-jury trial was held on January 4, 6, and 7, 2000 on the consolidated motion for preliminary injunction and trial on the merits. Plaintiffs did not request damages at trial. Plaintiffs moved for costs on March 17, 2000.

On August 4, 2000, the trial court issued its findings of fact, conclusions of law, orders, and judgment, ruling that Section 2 violated Plaintiffs' state constitutional right to collectively bargain and issued a permanent injunction against its enforcement.[6]

*the bargaining" as mandated by Article XIII, Section 2 of the Hawai'i State Constitution.*

13. *A legislative prohibition against the employer and employee discussing all cost items including wages is an unconstitutional infringement on the right to organize for the purpose of collective bargaining.* ... Section 2, Act 100, 1999 SLH is an unwarranted infringement of the constitutional right of public employees "to organize for the purpose of collective bargaining as provided by law."

14. It is uncontroverted that wages and cost items are the core of the subjects of collective bargaining in the private and public sectors.... By prohibiting bargaining over "cost-items" and establishing, in effect, a freeze in contractual terms on cost items from July 1, 1999 to July 2001, section 2, Act 100, 1999 SLH, abrogates the right of public employees "to organize for the purpose of collective bargaining as provided by law" under Article XIII, Section 2 of the Hawai'i State Constitution.

(Emphases added.)

Based on the findings and conclusions, the court ordered, adjudged and declared[ ] that Section 2, Act 100, 1999 SHL, is unconstitutional and null and void on grounds that it violates the right of public employees represented by Plaintiffs ... "to organize for the purpose collective bargaining as provided by law" in contravention of Article XIII, Section 2 of the Hawai'i State Constitution.

On August 29 through September 1, 2000, Defendants filed notices of appeal. On September 1, 2000, Plaintiffs filed a notice of cross-appeal. On September 5, 2000, the court awarded Plaintiffs costs of $6,044.60.

Defendant Yogi submits that the court committed reversible error in declaring Section 2 unconstitutional and in issuing an injunction against the enforcement of the Act. Yogi contends that article XIII, section 2 "recognize[s] a constitutional right to organize for the purpose of collective bargaining" but "does not create a right to collectively bargain." Yogi maintains that, by inserting the phrase as "provided by law", the framers intended for the legislature to retain the ultimate authority to govern the parameters of collective bargaining. According to Yogi, committee reports of the constitutional convention indicate the drafters's intent "to give complete discretion to the legislature to define the terms of collective bargaining for public employees." Yogi lists "numerous amendments" to HRS § 89–9 to show "[t]he legislature's power to control the scope of collective bargaining." Yogi concludes that "if the legislature had the power to grant public employees the right to collectively bargain over cost items, the legislation had the authority to suspend that right."

Defendants Kusaka and Yamashiro argue that (1) the legislature intended Section 2 to serve an important public interest; (2) HRS chapter 89 exhibits examples of the legislature's discretion to limit the right to bargain collectively; and (3) Plaintiffs suffered no irreparable injury.[7]

Plaintiffs assert that (1) the words "collective bargaining as provided by law" in article XIII, section 2 had "a well-recognized meaning in pre-existing federal and state statutes[ ] and five state constitutions" by 1968, and the term "law" referred "not just to statutory 'law,' but also to constitutional and case 'law' which gave substance and meaning to the words 'collective bargaining' "; (2) "the object of the 1968 amendment was to extend to public employees rights enjoyed by private employees"; and (3) their position is supported by the legislative history of HRS chapter 89, "contemporary 'understanding' " of the meaning of "collective bargaining as provided by law,". and case law from other states.

## II. STANDARDS OF REVIEW

### A. Constitutional Construction

We review questions of constitutional law *de novo*, under the right/wrong standard. *Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213, *recon. denied*, 91 Hawai'i 372, 984 P.2d 1198 (1999). "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case." *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000).

In interpreting a constitutional provision, "the words of the constitution are presumed to be used in their natural sense ... 'unless the context furnishes some ground to control, qualify or enlarge (them).' " *State ex rel. Amemiya v. Anderson*, 56 Haw. 566, 577, 545 P.2d 1175, 1182 (1976) (citation omitted).

"We have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent." *Convention Center Auth. v. Anzai*, 78 Hawai'i 157, 167,

---

The court also ordered and adjudged that Plaintiffs' request for permanent injunction be and is hereby granted. Accordingly, the above named Defendants, their officers, agents, servants, employees, and all other persons acting in concert or participation with them are permanently enjoined from enforcing Section 2, Act, 100, 1999 SLH, in its entirety.

7. Defendants argue that chapter 89 of the HRS contains several examples of how the legislature limited the scope, subjects, and time period for negotiations over costs items. *See e.g.*, HRS § 89–6 (excluding an entire class of "public employees" from bargaining collectively); HRS § 89–9 (excluding entire subjects from collective bargaining process); HRS § 89–10 (restricting the lifetime of collective bargaining agreements and when negotiations, including cost "items," may be reopened.) However, the examples cited by the Defendants are not issues before this court. Accordingly, we need not address the constitutionality of these cited sections of chapter 89.

890 P.2d 1197, 1207 (1995). "This intent is to be found in the instrument itself. When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument." *State v. Kahlbaun,* 64 Haw. 197, 201, 638 P.2d 309, 314, *recon. denied,* 64 Haw. 197, 638 P.2d 309 (1981) (citations omitted).

### B. *Statutory Interpretation*

"The constitutionality of a statute is a question of law which is reviewable under the right/wrong standard.... [T]his court has consistently held that every enactment of the legislature .is presumptively constitutional, and a party challenging the statute has the burden of showing unconstitutionality beyond a reasonable doubt. The infraction should be plain, clear, manifest and unmistakable." *State v. Bates,* 84 Hawai'i 211, 220, 933 P.2d 48, 57 (1997).

## III. *DISCUSSION*

"In the construction of a constitutional provision, the rule is well established that the words of the constitution are presumed to be used in their natural sense." *Employees' Ret. Sys. v. Budget Dir. Ho,* 44 Haw. 154, 159, 352 P.2d 861, 864–65 (1960). The words "as provided by law" do not appear to be ambiguous and therefore are presumed to be used in their natural sense. The court may look at "legal or other well accepted dictionaries as one way to determine the ordinary meaning of certain terms ... not defined." *State v. Kalama,* 94 Hawai'i 60, 63 n. 6, 8 P.3d 1224, 1227 n. 6 (2000).

At the time that the proposed amendment to article XII, section 2 (now article XIII, section 2) was drafted and ratified, the word "law" was understood to mean "a rule of conduct prescribed by lawmaking power of state" or "judicial decisions, judgments or decrees." *Black's Law Dictionary* 1028 (1968). "Provided" was defined as "[t]he

word used in introducing a proviso.... Ordinarily, it signifies or expresses a condition; but, this is not invariable; for according to the context, it may import a covenant, or a limitation or qualification, or a restraint, modification, or exception to something which precedes." *Id.* at 1388, 8 P.3d 1224. As written, the dependent clause "as provided by law" qualifies the preceding independent clause describing the right to organize for collective bargaining.

Similar principles of construction were applied to the identical phrase in article I, section 11, in *State v. Rodrigues,* 63 Haw. 412, 629 P.2d 1111 (1981).[8] Section 11 "create[d] the position of an independent grand jury counsel, [but] it fail[ed] to define the number of independent counsel required, appointment or removal procedure, qualifications, length of term, compensation, or source of funding." *Id.* at 414, 629 P.2d at 1113. In *Rodrigues,* the defendants argued that article I, section 11 was "self-executing" and "mandate[d] the immediate appointment of independent counsel to grand juries." *Id.* at 413, 629 P.2d at 1113. Disagreeing, this court observed that, at the time article I, section 11 was adopted, there was no other constitutional provision or statute to which the phrase "as provided by law" could refer. *Id.* at 415, 629 P.2d at 1114. We held that in the absence of a constitutional provision or statute to which "as provided by law" could refer, "subsequent legislation was required to implement the amendment." *Id.,* 629 P.2d at 1114.

Relying on cases from other jurisdictions, this court in *Rodrigues* observed that the phrase "as provided by law" has been interpreted as "a direction to the legislature to enact implementing legislation," that "the subject matter which this phrase modifies is not locked into the Constitution but may be dealt with by the Legislature as it deems appropriate," and that the phrase "directs the legislature to provide the rule by which

---

**8.** Article I, section 11 provides as follows:

Whenever a grand jury is impaneled, there shall be an independent counsel appointed as *provided by law* to advise the members of the grand jury regarding matters brought before it. Independent counsel shall be selected from among those persons licensed to practice law by the supreme court of the State and shall not be a public employee. The term and compensation for independent counsel shall be as provided by law.

(Emphasis added).

the general right which it (the constitutional provision) grants may be enjoyed and protected." *Id.*, 629 P.2d at 1114. Defendant Yogi rely heavily on *Rodrigues* to support their argument that the legislature has an unfettered discretion to enact law which take away all issues from the process of collective bargaining. Defendant Yogi contends that "as provided by law" clearly indicates that legislation is required before the right created becomes enforceable.

Defendants' reliance on *Rodrigues* is inapposite. The context in which the phrase as "provided by law" in *Rodrigues* was used is factually distinguishable from the situation presented in the instant case. Unlike the amendment at issue in *Rodrigues,* when article XII, section 2 was amended in 1968, there were pre-existing federal and state statutes, constitutional provisions, and court cases which give meaning to the term "collective bargaining."

Before the framers convened in 1950, the Wagner Act, as amended, defined collective bargaining as the "mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d) (2002). In 1945, territorial lawmakers modeled Hawai'i's first collective bargaining statute after Wagner Act, and specifically defined collective bargaining in the Hawai'i Employment Relations Act as follows:

> "Collective bargaining" is the negotiating by an employer and a majority of the employer's employees in a collective bargaining unit (or their representatives) concerning representation or terms and conditions of employment of such employees in a mutually genuine effort to reach an agreement with reference to the subject under negotiation.

HRS § 377-1(5).

Private and public employees had already been granted varying degrees of constitutional protection for collective bargaining in the states of New York in 1939, Florida in 1944, Missouri in 1945, and New Jersey in 1947. The framers acknowledged their awareness of the statutory and state constitutional provisions in formulating and adopting article XII in 1950, and considered the right of employees fundamental enough to grant it constitutional foundations as four other states had done. 1 *Proceedings 1950* at 236, 238–39.

Before the voters ratified the constitutional provision, by plebiscite held on June 27, 1959, the United States Supreme Court had clarified that the right to organize for collective bargaining obligated employers to negotiate in good faith over wages, hours, and other terms and conditions of employment. *Local 24 of the Int'l Bhd. v. Oliver,* 358 U.S. 283, 295, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959).

The record of the proceedings at the 1968 constitutional convention verified that the framers actually knew wh at "collective bargaining as provided by law" (or as "prescribed by law") meant. 1 *Proceedings 1968* at 207, 342, 429. In fact, they were even provided a written opinion by the Attorney General on the legal question.

> "Collective bargaining" has been defined as: "[A] procedure looking toward the making of a collective agreement between the employer and the accredited representative of his employees concerning wages, hours, and other conditions of employment." 51 CJS, *Labor Relations* (1967 ed.), sec. 148.

1 *Proceedings 1968* at 479.

Thus, unlike the provision at issue in *Rodrigues,* "collective bargaining as provided by law" had a well recognized meaning, usage, and application under both federal and state laws as well as case law.[9] At the time article XII, section 2 was amended, there were federal, state, and case laws to which the phrase "collective bargaining as provided by law" could refer. Accordingly, we must consider the constitutionality of Section 2 of Act 100 in

---

**9.** Our understanding that the word "law" could also refer to case law is not a novel idea. For example, in *Konno v. County of Hawai'i,* we held that the phrase "as defined by law" in Article XVI, Section 1 required an examination of "statutory law and case law." 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997).

light of these other sources of law which give meaning to that provision.

Our state's constitution " 'must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional provision is to give effect to that intent.' " *Hirono v. Peabody*, 81 Hawai'i 230, 232–33, 915 P.2d 704, 707 (1996). "This intent is to be found in the instrument itself." *Kahlbaun*, 64 Haw. at 201, 638 P.2d 309.

Based upon our careful review of the proceedings of the constitutional convention, we find that the framers of article XII, section 2 did not intend to grant our legislators complete and absolute discretion to determine the scope of "collective bargaining." There are evidence in the 1968 proceedings indicating that the framers were not in favor of granting the legislature the ultimate power to deny the right to organize for the purpose of collectively bargaining. For instance, the framers defeated an amendment in the committee of the whole to limit public employee rights to "procedures as established by law in the areas therein prescribed" by a vote of 62 to 13. 1 *Proceedings 1968* at 495. Moreover, when Delegate Kauhane voiced his understanding of the purpose of Committee Proposal No. 5 (thereafter adopted as article XII, section 2), it was evident that no one opposed such interpretation. Delegate Kauhane remarked:

> Mr. Chairman, I speak in favor of Proposal No. 5. The purpose and intent of Proposal No. 5 is to protect the right to organize for the purpose of collective bargaining. As a matter of Constitutional right, however, that right is subject to reasonable regulation by the legislature. That's why the insertion of the words "as prescribed by law" or probably some would like to have the words "in accordance with law." Certainly, Mr. Chairman, the legislators should be prevailed upon to take their stand on this matter of providing the necessary regulations as prescribed by law. This is one of the responsibilities and they should not shirk this responsibility in providing the necessary regulations for collective bargaining by government employees.

1 *Proceedings 1968* at 497–98. Delegate Kauhane observed:

> Perhaps the words "as prescribe by law" mean that the right of collective bargaining and the right to organize don't exist until the legislature prescribes and recognizes that right. And therefore the legislature should at this time recognize this right and establish regulations for the right for collective bargaining. To recognize the right to organize for the purpose of collective bargaining is a matter of policy. *It does not mean that the legislature can take away that right nor remove that right, of the public employees to organize and bargain collectively.* This proposal is for the purpose, the full purpose of protecting the rights of public employees to organize for the specific purpose of collective bargaining. I urge that the proposal submitted by the committee be approved.

1 *Proceedings 1968* at 498 (emphasis added). Thereafter, Committee Proposal No. 5 was adopted by a vote of 57 to 17. The fact the none of the framers rose to oppose such interpretation was a strong indicia of the framers' acquiescence to Delegate Kauhane's understanding of the phrase "as prescribed by law."

That the framers did not intend to grant the legislature absolute discretion to take away the right to collectively bargain altogether is also evident in Delegate Yoshinaga's remarks during the 1968 proceedings. He pleaded:

> All that the government employees ask here is the right of an expression in our Constitution, the finest document in the land, we hope when we get through, that they too shall have the right not only to organize but to use that organization for collective bargaining purposes so that can better their standard of living, so they can walk and live and study and play in Hawai'i like all employees.

> Mr. Chairman, all they ask is that right from this Convention. *That right will have to be implemented by legislation and if the legislature fails, perhaps that right will be taken into court for court action, I do not know. But that is all government employees are asking.*

I urge all of you here, if you do nothing else in this convention, to adopt one principle that declares to anyone who works in Hawai'i that in Hawai'i at least we recognize that there may be some differences between the private employees and the public employees, but that the people of Hawai'i, through our constitutional delegation, are trying to make people equal here whether they work for the private industrial empire here or for the government of the State and county.

1 *Proceedings 1968* at 497 (emphasis added). Based upon Delegate Yoshinaga's remarks, it is clear that the intent and object of the framers was to extend to public employees similar rights to collective bargaining previously adopted in 1950 for "persons in private employment" under article XII, section 1 of the Constitution. 1 *Proceedings 1968* at 497. A construction of article XII, section 2 that would allow the legislature to have absolute power to deny public employees the right to negotiate on core issues of collective bargaining is simply inconsistent with the framers' objectives in adopting this provision.

In construing a constitutional provision, the court can also look to understanding of voters who ratified the constitutional provision, and legislative implementation of constitutional amendment. *Kahlbaun*, 64 Haw. at 202, 638 P.2d 309. At the time the people voted, the word "collective bargaining as prescribed by law" had a well recognized meaning. Black's defined "collective bargaining" as follows:

COLLECTIVE BARGAINING. As contemplated by National Labor Relations Act is a procedure looking toward making of collective agreements between employer and accredited representatives of employees *concerning wages, hours, and other conditions of employment,* and requires that parties deal with each other with open and fair minds and sincerely endeavor to overcome obstacles existing between them to the end that employment relations may be stabilized and obstruction to free flow of commerce prevented.

*Black's Law Dictionary* 328–29 (1968) (emphasis added). Webster's defines the phrase "collective bargaining" as:

[A] negotiation for the settlement of terms of collective agreement between an employer or group of employers on one side and a union or number of unions on the other; broadly, any union-management negotiation.

"Collective agreement" is defined as:

[A]n agreement between an employer and a union usually reached through collective bargaining and *establishing wage rates, hours of labor, and working conditions.*

*Webster's Third New International Dictionary* (1966) (emphasis added). Finally, Random House defines "collective bargaining" as follows:

[T]he process by which *wages, hours, rules, and working conditions are negotiated* and agreed upon by a union with an employer for all the employees collectively whom it represents.

*Random House Unabridged Dictionary* (1967) (emphasis added).

In light of the foregoing definitions of "collective bargaining," it is clear that, when the people ratified article XII, section 2, they understood the phrase to entail the ability to engage in negotiations concerning core subjects such as wages, hours, and other conditions of employment. Section 2 of Act 100 violates article XII, section 2, because it withdraws from the bargaining process these core subjects of bargaining that the voters contemplated.

Granting the lawmakers absolute discretion to define the scope of collective bargaining would also produce the absurd result of nullifying the "right to organize for the purpose of collective bargaining." A constitutional provision must be construed "to avoid an absurd result" and to recognize the mischief the framers intended to remedy. *State v. City of Sherwood*, 489 N.W.2d 584, 588 (N.D.1992). As a matter of policy, we do not blindly apply rules of construction to the point that we reach absurd conclusions that are inconsistent with the intent of our lawmakers. *See e.g., State v. Kahlbaun*, 64 Haw. 197, 206, 638 P.2d 309, 317 (1981) ("A legislative construction implementing a constitutional amendment cannot produce an absurd result or be inconsistent with the pur-

poses and policies of the amendment."); *Dines v. Pac. Ins. Co., Ltd.,* 78 Hawai'i 325, 337, 893 P.2d 176, 188 (1995) (Ramil, J., dissenting) (*citing Richardson v. City & County of Honolulu,* 76 Hawai'i 46, 60, 868 P.2d 1193, 1207, *recon. denied,* 76 Hawai'i 247, 871 P.2d 795 (1994)) ("Statutory construction dictates that an interpreting court should not fashion a construction of statutory text that effectively renders the statute a nullity or creates an absurd or unjust result.").

Here, the intent and object of the framers who adopted article XII, section 2 was to extend to public employees similar rights to collective bargaining previously adopted for private employees under article XII, section 1.[10] Defendants' construction of article XII, section 2 would render that provision meaningless, because, if we follow the Defendants' reading of that provision to its logical conclusion, it would be possible for the legislature to establish a freeze in contractual terms on cost items not only for two years but for two decades. Surely, the framers did not contemplate such an absurd and unjust result, especially in light of the fact that their foremost intent in drafting this constitutional provision is to improve the standard of living of public employees.[11] Accordingly, we reject Defendants' contention that the phrase "as provided by law" gave the legislature complete discretion to take away public employees' right to organize for the purpose of collective bargaining. Such reading is contrary to the underlying object and purpose of the constitutional provision.[12]

## IV. CONCLUSION

Based on the foregoing, we hold that Section 2 of Act 100, 1999 Haw. Sess. L., violates the rights of public employees under article XIII, section 2 of the Hawai'i Constitution.

The circuit court's judgment is hereby affirmed.

RAMIL and ACOBA, JJ.; and NAKAYAMA, J., concurring separately, with whom MOON, C.J., and LEVINSON, J., join; and ACOBA, J., concurring separately.

Concurring Opinion by NAKAYAMA, J., In which MOON, C.J., and LEVINSON, J., join.

I agree with Justice Ramil's conclusion that Section 2 of Act 100, 1999 Haw. Sess. L. (Section 2), violates article XIII, section 2 of the Hawai'i Constitution, inasmuch as the legislature went beyond its constitutional authority in abrogating altogether the right of public employees to organize for the purpose

---

**10.** Article XII, section I of the Hawai'i Constitution states, "Persons in private employment shall have the right to organize for purposes of collective bargaining."

**11.** That the framers' primary intent was to better the lives of public employees is evident in the pleas of supporters of Committee Proposal No. 5., such as that made by Delegate Yamamoto:

Therefore, I do urge you fellow delegates, let us give public employees a fair shake and not rate them as second-class citizens, they are by an large dedicated workers.
1 *Proceedings 1968* at 477.

**12.** To support their contention that the framers intended to give absolute discretion to the legislature in defining the terms of collective bargaining for public employees, Defendants rely heavily upon selected portions of committee reports. To give effect to the intention of the framers and the people adopting a constitutional provision, examination of debates, proceedings and committee reports is useful. However, "the debates, proceedings and committee reports do not have binding force on this court and their persuasive value depends upon the circumstances of each case." *Kahlbaun,* 64 Haw. at 204, 638 P.2d at 316. While there is some evidence in the convention reports to suggest deferral to legislation action, the portions relied upon by Defendants were focused on the issue of the right to strike and who should determine that question. For example, to support his position, Defendant Yogi cites to the committee report stating that:

This amendment providing, "collective bargaining as prescribed by law," allayed the opposition and concern expressed by some members of your committee.... In the case of public employees the rights of collective bargaining will be restricted to those areas in such a manner as will be determined by the legislature.
1 *Proceedings 1968* at 207 (quoting Stand. Comm. Rep. No. 42). Defendant Yogi overlooked the sentence following the above quoted passage. That sentence read, "Therefore, the right to strike determination." By reading the two passages together, it becomes clear that the second passage qualified the meaning of first, so that deferral to legislative action is intended to be observed only on the issue of the right to strike.

of collective bargaining. I write separately to clarify the reason for this conclusion.

Article XIII, section 2 of the Hawai'i Constitution provides that "[p]ersons in public employment shall have the right to organize for the purpose of collective bargaining *as provided by law.*" Haw. Const. art. XIII, § 2 (emphasis added). Pursuant to this provision, the legislature is given broad discretion in setting the parameters for collective bargaining. Indeed, the legislature has constitutionally exercised such discretion on previous occasions. *See* Hawai'i Revised Statutes (HRS) § 89–6 (1993) (establishing bargaining units); HRS § 89–9(d) (1993) (specifying matters that are not subject to collective bargaining); HRS § 89–10(c) (1993) (determining the expiration date for collective bargaining agreements and proscribing the reopening of cost items during the term of the agreement).

While the legislature is given broad discretion pursuant to article XIII, section 2, the language "as provided by law" does not give the legislature unfettered discretion to infringe upon the core principles of collective bargaining.

> The fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it. This intent is to be found in the instrument itself. When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument.

*State v. Kahlbaun,* 64 Haw. 197, 201, 638 P.2d 309, 314 (1981) (citations omitted). In this case, the intent is found in the instrument itself. The language "as provided by law" in article XIII, section 2 does not provide the legislature with unfettered discretion to enact laws that completely abrogate the right of public employees to organize for the purpose of collective bargaining pursuant to article XIII, section 2. Interpreting this language in such a manner would produce an absurd result inconsistent with the intent of the framers. *See In re Application of Pioneer Mill Co.,* 53 Haw. 496, 500, 497 P.2d 549, 552 (1972) ("We are always reluctant to decide that the constitutional draftsmen in-

tended to accomplish what appears to be an absurd result.").

Inasmuch as article XIII, section 2 does not grant the legislature unfettered discretion to infringe on the core principles of collective bargaining, the legislature went beyond its constitutional authority in enacting Section 2. Article XIII, section 2 expressly provides that "[p]ersons in public employment shall have the right to organize *for the purpose of collective bargaining* as provided by law." Haw. Const. art. XIII, § 2 (emphasis added). "Collective bargaining" is defined as

> the performance of the mutual obligations of the public employer and an exclusive representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to wages, hours, amounts of contributions by the State and counties to the Hawai'i public employees health fund, and other terms and conditions of employment, except that by any such obligation neither party shall be compelled to agree to a proposal, or be required to make a concession.

HRS § 89–2 (Supp.2001). Section 2 amended HRS § 89–9(a) by adding the following underscored language, thus prohibiting altogether negotiation over "cost items" for two years:

> The employer and the exclusive representative shall meet at reasonable times, including meetings in advance of the employer's budget-making process, and shall negotiate in good faith with respect to wages, hours, the number of incremental and longevity steps and movement between steps within the salary range, the amounts of contributions by the State and respective counties to the Hawai'i public employees health fund to the extent allowed in subsection (e), and other terms and conditions of employment which are subject to negotiations under this chapter and which are to be embodied in a written agreement, or any question arising thereunder, but such obligation does not compel either party to agree to a proposal or make a concession; *provided that the parties may not negotiate with respect to cost items as defined by section 89–2 for the biennium 1999 to 2001, and the cost items*

*of employees in bargaining units under section 89–6 in effect on June 30, 1999, shall remain, in effect until July 1, 2001.* HRS § 89–9(a) (Supp.2001) (emphasis added). "Cost items" are defined as "all items agreed to in the course of collective bargaining that an employer cannot absorb under its customary operating budgetary procedures and that require additional appropriations by its respective legislative body for implementation." HRS § 89–2. It is undisputed that wages and cost items are among the core subjects of collective bargaining. *See* HRS § 89–3 (Supp.2001) ("Employees shall have the right of self-organization ... for the purpose of collectively bargaining ... on questions of wages, hours, and other terms and conditions of employment...."); HRS § 89–9(a) (quoted *supra*); *Ford Motor Co. v. NLRB*, 441 U.S. 488, 490–91, 99 S.Ct. 1842, 60 L.Ed.2d 420, n. 2 (1979) ("As originally enacted, the Wagner Act [of 1935] did not define the subjects of [the] obligation to bargain [imposed by § 8(a)(5) of the National Labor Relations Act], although § 9(a), which was contained in the Wagner Act, made reference to 'rates of pay, wages, hours of employment, or other conditions of employ-

ment.' Section 8(d) was added by the Taft–Hartley amendments to the Act in 1947, and expressly defined the scope of the duty to bargain as including 'wages, hours, and other terms and conditions of employment.' "). Thus, by enacting Section 2, which completely prohibited negotiation of "cost items," the legislature was in fact abrogating the right of public employees to "organize for the purpose of collective bargaining." The legislature did not have the constitutional authority to enact a law that in effect completely abrogated the right granted under article XIII, section 2 of the Hawai'i Constitution. It is for the foregoing reasons that I concur with Justice Ramil's conclusion.

Concurring Opinion of ACOBA, J.

I agree with Justice Ramil that Section 2 of Act 100, 1999 Haw. Sess. L. (Section 2), violates the core of Article XIII, Section 2 of the Hawai'i Constitution, inasmuch as relevant history confirms that the right to organize and bargain collectively was to remain inviolate.[1]

I.

As conceded by Plaintiffs at oral argument, Plaintiffs' claim for injunctive relief has be-

---

1. Because this opinion construes the constitution, I agree with its publication. *See e.g.*, Mich. Ct. R. 7.215(A)-(B) ("A court opinion must be published if it involves a legal issue of continuing public interest."); 4th Cir. R. 36(a) (an opinion will be published if it involves a legal issue of continuing public interest); 5th Cir. R. 47.5.1 (an opinion is published if it "concerns or discusses a factual or legal issue of significant public interest").

In that regard, Justice Ramil has recommended a rule which would require publication of a case at the request of one justice. *See Doe v. Doe*, 99 Hawai'i 1, 15, 52 P.3d 255, 269 (2002) (Ramil, J., dissenting). As one commentator has said of this rule,

the "one justice publication" rule, unlike the "majority rules" rule, faithfully abides by the premises upon which [summary disposition orders] and memorandum opinions were based, promotes judicial accountability, and facilitates a judge or justice's role in the legal system—without sacrificing judicial economy.

N.K. Shimamoto, *Justice is Blind, But Should She be Mute?*, 6 Hawai'i B.J. 6, 12 (2002).

Nothing highlights the inefficacy or undermines the rationalization of a "majority rules" approach to publication more than the proposal submitted to this court on June 14, 2002, by the Hawai'i Chapter of the American Judicature Society (AJS), to permit (1) citation to unpublished

opinions as persuasive authority and (2) petitions for publication of unpublished cases based on "a *problem* perceived by the legal community with the continued use of summary disposition orders and ... memorandum opinions." Report of AJS Special Committee on Unpublished Judicial Opinions Hawai'i Chapter of American Judicature Society § IV (2002) (emphasis added).

Also, the dissatisfaction with the number of unpublished opinions is one reason why the State legislature authorized two additional judges on the Intermediate Court of Appeals (ICA) level in 2001. *See* Stand. Comm. Rep. No. 1460, in 2001 House Journal, at 1495 (finding that the procedures and processes employed to deal with the appellate case load have "caus[ed] some litigants to question whether the parties are getting due process[ ]" and as an example, stating that "a large number of cases were decided by summary disposition orders instead of opinion, and oral argument has become rare").

Justice Ramil and I have agreed and will continue to agree to a recommendation by one of the other justices to publish a case even if the majority will not adhere to such a policy. We do so because we support and respect the opinion of any one of our colleagues that a decision warrants publication and that the views raised in the opinion should be disseminated and that a one justice rule best makes use of the wisdom and experience of each justice.

come moot. From June 30, 1999, the effective date of Act 100, *see* 1999 Haw. Sess. L. Act 100, § 9, at 370, through August 4, 2000, the date the circuit court issued its injunction, no wage increases were honored by Defendants, except the arbitration award issued to the State of Hawai'i Organization of Police Officers (SHOPO).[2] When Act 100 expired on July 1, 2001, there was no longer any restriction on the employees' rights to collectively bargain or any reason to maintain the status quo for contracted cost items.

Since the legislature prohibited negotiations over cost items only for the biennium 1999 to 2001 and not for any other period, *see id.*, § 2, at 368–69 [hereinafter Section 2], the parties were free to negotiate over cost items after July 1, 2001. Furthermore, the freezing of cost items, in effect on June 30, 1999, was removed after July 1, 2001. The statutory impediment to negotiations and the mandate to freeze cost items no longer exists. Therefore, there is presently nothing to be enjoined. The employers and public employees are no longer statutorily prevented from negotiating on cost items. Consequently, the injunctive relief claim is moot.

## II.

### A.

However, Plaintiffs' claim for declaratory judgment is not moot.[3] "In the words of [Hawai'i Revised Statutes (HRS)] § 632–1, the dispositive question is whether 'the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.' This is a question of law." *Island Ins. Co. v. Perry*, 94 Hawai'i 498, 502, 17 P.3d 847, 851 (App.2000). In determining whether parties "still retain sufficient interests and injury as to justify the award of declaratory relief[,] ... [the] question is 'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant ... a declaratory judgment.'" *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941)). As a matter of law, there manifestly remains a substantial controversy in this case.

At the heart of this appeal is the scope of the constitutional right afforded to public employees to collectively bargain,[4] as well as the extent of the legislature's power to limit that right. On appeal, Plaintiffs have argued, among other things, that: (1) "the lower court erred by failing to recognize Article XIII, section 2 rights as 'fundamental' [and] refusing to apply [a] strict scrutiny [construction] to [that section]"; (2) "because

**2.** The circuit court found that "[o]n and after July 1, 1999, some police officers, depending on their anniversary dates, began receiving wage adjustments" and that "[o]n January 1, 2000, police officers in bargaining unit 12 received an across the board increase of 1 percent in wages...." Plaintiffs claim that Section 2 of Act 100, *see* 1999 Haw. Sess. L. Act 100, § 2, at 368–69, was discriminatorily enforced because Defendants granted SHOPO wage increases after the effective date of the Act, in violation of their right to equal protection of the laws.

**3.** Hawai'i Revised Statutes (HRS) § 632–1 (1993) authorizes actions for declaratory judgments. It provides in pertinent part as follows:

In cases of actual controversy, courts of record, within the scope of their respective jurisdictions, shall have power to make binding adjudications of right, *whether or not consequential relief is, or at the time could be, claimed, and no action or proceeding shall be open to objection on the ground that a judgment or order merely declaratory of right is prayed*

*for;* provided that declaratory relief may not be obtained in any district court....

Relief by declaratory judgment may be granted in civil cases where an actual controversy exists between contending parties, or where the court is satisfied that antagonistic claims are present between the parties involved which indicate imminent and inevitable litigation, or *where in any such case the court is satisfied that a party asserts a legal relation, status, right, or privilege in which the party has a concrete interest and that there is a challenge or denial of the asserted relation, status, right, or privilege by an adversary party who also has or asserts a concrete interest therein, and the court is satisfied also that a declaratory judgment will serve to terminate the uncertainty or controversy* giving rise to the proceeding.

(Emphases added.)

**4.** Article XIII, section 2 of the Hawai'i Constitution reads, "Persons in public employment shall have the right to organize for the purpose of collective bargaining as provided by law."

[SHOPO] was not subjected to the enforcement of Section 2, that law was enforced in violation of Plaintiffs' equal protection rights[,]" *see supra* note 2; (3) "prohibiting the executive branch to negotiate cost items and imposing a freeze on wages[, as imposed by section 2,] violates the separation of powers doctrine"; and (4) "legislation [such as section 2] adopted with a broad title and containing multiple and separate subjects is unconstitutional."

### B. ·

At this stage in our jurisprudence, our appellate courts have merged two, sometimes overlapping, yet distinct exceptions to the mootness doctrine: the "public interest" exception and the "capable of repetition, yet evading review" exception.

An allusion to the "public interest" exception first appeared in our jurisprudence in *Johnston v. Ing*, 50 Haw. 379, 441 P.2d 138 (1968). There, this court stated that

*[t]here is a well settled exception to the rule that appellate courts will not consider moot questions.* When the question involved affects the public interest, and it is likely in the nature of things that similar questions arising in the future would likewise become moot before a needed authoritative determination by an appellate court can be made, the exception is invoked.

*Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question.*

*Id.* at 381, 441 P.2d at 140 (internal quotation marks and citations omitted) (emphases added). The foregoing quote was taken from *In re Brooks*, 32 Ill.2d 361, 205 N.E.2d 435, 437–38 (1965). In that case, the Supreme Court of Illinois acknowledged that the issue there was moot but said that, "when the issue presented is of substantial *public interest,* a well-recognized exception exists to the general rule that a case which has become moot will be dismissed upon appeal." *Id.* (empha-

sis added) (citing M.A. Leffingwell, Annotation, *Public Interest as Ground for Refusal to Dismiss an Appeal, Where Question has Become Moot, or Dismissal is Sought by One or Both Parties,* 132 A.L.R. 1185 (1941) [hereinafter *Public Interest as Ground for Refusal* ]). The *Brooks* court established three criteria for the public interest test, stating that there must be "[ (1) ] the existence of the requisite degree of public interest [in] the public or private nature of the question presented, [ (2) ] the desirability of an authoritative determination for the future guidance of public officers, and [ (3) ] the likelihood of future recurrence of the question." *Id.* at 438. "Applying these criteria," the *Brooks* court decided the merits of the case. *Id.* Later, seemingly in *dicta,* the *Brooks* court observed that "the very urgency which presses for prompt action by public officials makes it probable that any similar case arising in the future will likewise become moot by ordinary standards before it can be determined by this court." *Id.* A review of the annotation cited by the *Brooks* court indicates that the mootness doctrine was "modified or abrogated [when] the appeal involve[d] questions of *public interest.*" Leffingwell, *Public Interest as Grounds for Refusal, supra,* at 1185–86 (emphasis added).

In *Johnston,* this court melded the "public interest" criteria with the observation by the *Brooks* court that a similar case may become moot before review was possible. *See* 50 Haw. at 381, 441 P.2d at 139. This approach was followed in subsequent cases. *See Alfapada v. Richardson,* 58 Haw. 276, 277–78, 567 P.2d 1239, 1241 (1977); *Wong v. Board of Regents, University of Hawai'i,* 62 Haw. 391, 395, 616 P.2d 201, 204 (1980); *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 87–88, 734 P.2d 161, 165–66 (1987); *cf. State v. Cullen,* 86 Hawai'i 1, 13, 946 P.2d 955, 967 (1997) ("Our affirmance of Cullen's conviction moots the prosecution's points on cross-appeal. However, this court has long recognized the exception to the mootness doctrine that arises with respect to matters affecting the public interest." (Citations omitted.)). None of these cases contained the "capable of repetition, yet evading review" language.

The evading review exception was first expressly stated in this jurisdiction in *Life of the Land v. Burns,* 59 Haw. 244, 580 P.2d 405 (1978). In that case, this court initially referred to the public interest exception, quoting *Johnston,* then related that there was a "similar" exception described as "capable of repetition, yet evading review":

A *similar* view was stated in *Valentino v. Howlett,* 528 F.2d 975[,] 979–980 (7th Cir. 1976):

There is an exception to this precept, however, that occurs in cases involving a legal issue which is capable of repetition yet evading review. *The phrase, "capable of repetition, yet evading review," means that a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because of the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit.*

*Id.* at 251, 580 P.2d at 409–10 (emphases added).

While the evading review language has been applied without discussion of a public interest exception, *see In re Application of Thomas,* 73 Haw. 223, 227, 832 P.2d 253, 255 (1992); *Ariyoshi v. Hawai'i Pub. Employment Relations Bd.,* 5 Haw.App. 533, 535 n. 3, 704 P.2d 917, 921 n. 3 (1985), several cases have either treated the public interest exception as part of the "capable of repetition" exception or have not clarified a distinction between the two. *See Okada Trucking v. Board of Water Supply,* 99 Hawai'i 191, 196, 53 P.3d 799, 804 (2002) ("[W]e have repeatedly recognized an exception to the mootness doctrine in cases involving questions that affect the public interest and are 'capable of repetition yet evading review.'" (Citations omitted.)); *Carl Corp. v. State,* 93 Hawai'i 155, 165, 997 P.2d 567, 577 (2000) (outlining the "capable of repetition exception," then stating that "the present case clearly involves matters of public concern"); *McCabe Hamilton & Renny Co. v. Chung,* 98 Hawai'i 107, 120, 43 P.3d 244, 257 (App.2002) ("In sum, we believe that this is not the exceptional situation, affecting the public interest, that is capable of repetition, yet evading review." (Internal quotation marks and citations omitted.)). Also, the public interest language has been utilized without reference to the evading review phrase. *See Kona Old Hawaiian Trails,* 69 Haw. at 87, 734 P.2d at 165; *Cullen,* 86 Hawai'i at 13, 946 P.2d at 967.

III.

A.

Despite this jurisdiction's apparent merger of the two exceptions, other jurisdictions continue to recognize the exceptions as separate and distinct. Thus, courts recognize the public interest test as a separate exception to the general rule regarding mootness. *See, e.g., State v. Roman,* 2002 WL 1974061, *5 (Me.Super.Ct. Aug. 1, 2002) ("The Law Court ... has recognized *three* exceptions to mootness where a defendant has already been released from custody: (1) where collateral consequences will result; (2) where questions of great public interest may be addressed; and (3) where the issues are capable of repetition yet escape appellate review." (Emphasis added.) (Citations omitted.)); *Shah v. Richland Mem'l Hosp.,* 350 S.C. 139, 564 S.E.2d 681, 687 (S.C.Ct.App.2002) (explaining that, in civil cases, three exceptions may apply to the mootness doctrine, and listing them as issues that are "capable of repetition yet evading review[,]" "questions of imperative and manifest urgency to establish a rule for future conduct in matters of important public interest[,]" and "decision[s] by the trial court [which] may affect future events, or have collateral consequences for the parties" (citation omitted)); *Fraternal Order of Police v. City of Philadelphia,* 789 A.2d 858, 860 (Pa.Commw.Ct.2002) ("Exceptions are made, however, where the conduct complained of is capable of repetition yet likely to evade review, where the case involves issues important to the public interest *or* where a party will suffer some detriment without the court's decision." (Emphasis added.) (Citation omitted.)); *DeCoteau v. Nodak Mut. Ins. Co.,* 636 N.W.2d 432, 437 (N.D.2001) ("Issues characterized as moot may nonetheless be decided by this Court if the controversy is capable of repetition, yet evading review, *or* if the controversy is one of great

public interest and involves the power and authority of public officials." (Emphasis added.) (Citation omitted.)); *In re Brooks,* 143 N.C.App. 601, 548 S.E.2d 748, 751 (2001) (reporting that five exceptions to mootness have been recognized by the North Carolina appellate courts, and listing two of them as the " 'capable of repetition yet evading review' exception" and the "public interest exception" (citations omitted)).

### B.

On the other hand, in applying the evading review exception, courts in general require only two elements: "[(1)] the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration; and [(2)] there was a reasonable expectation that the same complaining party would be subject to the same action again." C. Wright, *Law of Federal Courts* § 12 (4th ed.1983) (citing *Murphy v. Hunt,* 455 U.S. 478, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982); *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975)); *see also Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *State v. Fernald,* 168 Vt. 620, 723 A.2d 1145, 1146 (1998) (noting the two elements); *Matter of Woodruff,* 567 N.W.2d 226, 228 (S.D.1997) (expressing the two elements for the "capable of repetition, yet evades review" exception); *Board of Educ. v. City of New Haven,* 221 Conn. 214, 602 A.2d 1018, 1019 (1992) (stating the two elements for "capable of repetition, yet evades review" exception); *see, e.g.,* 5 Am. Jur.2d *Appellate Review* § 646 (2002) (in the absence of a class action, only two elements are required for the evading review exception) and cases cited therein.

### IV.

In light of the fact that we are a state court, as to which review of moot cases is restricted only by self-imposed prudential

considerations, *see* H. Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function,* 114 Harv. L.Rev. 1833, 1861 (2001) [hereinafter *State Courts and the "Passive Virtues"*] (state courts treat mootness as "a principle of judicial restraint" without "constitutional jurisdictional underpinnings[ ]" (citations and footnotes omitted)), I believe it is appropriate that we distinguish between the public interest and the evading review exceptions inasmuch as they encompass different considerations.

I see no reason why our mootness exceptions should be stricter than that controlling in the federal courts, which are expressly limited by the article III "case or controversy" requirement in the United States Constitution. *See Crane v. Indiana High Sch. Athletic Ass'n,* 975 F.2d 1315, 1318 (7th Cir. 1992) ("Under Article III of the Constitution, our jurisdiction extends only to actual cases and controversies. We have no power to adjudicate disputes which are moot." (Citations omitted.)). There is no basis in the Hawai'i State Constitution [5] for such an approach, nor, in the interest of substantial justice, should we impose such prudential restraints upon this court. *See* Hershkoff, *State Courts and the "Passive Virtues", supra,* at 1837 ("State courts more typically find it their duty to resolve constitutional questions that federal courts would consider moot, elaborating constitutional norms as 'a matter of public interest' on the view that the other branches will benefit from receiving 'authoritative adjudication for further guidance.' " (Citations and footnotes omitted.)); *Carroll County Ethics Comm'n,* 119 Md.App. 49, 703 A.2d 1338, 1342 (Md.Ct. Spec.App.1998) ("Unlike the Article III constitutional constraints on the federal courts ... our mootness doctrine is based entirely on prudential considerations. As a result, we may decide a case, even though it is moot, where there is an imperative and manifest

---

**5.** For instance, the most relevant section of article VI states:

**Judicial Power**

**Section 1.** The judicial power of the State shall be vested in one supreme court, one intermediate appellate court, circuit courts, district courts and in such other courts as the

legislature may from time to time establish. The several courts shall have original and appellate jurisdiction as provided by law and shall establish time limits for disposition of cases in accordance with their rules.

Haw. Const. art. VI, § 1 (1993) (boldfaced font in original).

urgency to establish a rule of future conduct in matters of important public concern[.]" (Citations omitted.)). In my view, both exceptions apply in the instant case.

## V.

### A.

To reiterate, a public interest exception implicates a three-pronged test requiring that: (1) there is a public interest at stake, (2) determination of the matter would assist public officers in the future, and (3) the question is likely to recur. Undoubtedly, the public interest is involved in this case. During oral argument, Plaintiffs' counsel explained that the plaintiffs in this case are four unions representing 48,000 workers. As Plaintiffs report in their Opening Brief, "over a period of nearly thirty years[,] employee representatives and their employer counter parts [sic] in the executive branch have freely engaged in bargaining over wages, hours, and other terms and condition of employment[.]"

This court has said that collective bargaining affects the public interest, inasmuch as "good faith bargaining or negotiation is fundamental in bringing to fruition the legislatively declared policy 'to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government.'" *Board of Educ. v. Hawai'i Pub. Employees Rel. Bd.*, 56 Haw. 85, 87, 528 P.2d 809, 811 (1974). The "legislatively declared policy" outlined in HRS § 89-1 (1993), the statement of findings and policy regarding collective bargaining in public employment, includes the legislature's judgment that "government is made more

effective" if "public employees have been granted the right to share in the decision-making process affecting wages and working conditions[.]" Disruption of government services caused by collective bargaining disputes can have a substantial impact on the public in general. Between 1990 and 2000, there were approximately twenty work stoppages in this state, totaling more than 235,771 days of lost work and services. *See The State of Hawai'i Data Book 2000: A Statistical Abstract* 415 (2001). Plainly, the issues in this case affect significant public interests.

Second, in this context, it is eminently desirable that authoritative guidance be established for the benefit of public officers. First, as stated *infra*, counsel for the State urged this court to define the legislature's power in limiting the right to collectively bargain. The executive branch, which engages in bargaining with public worker unions,[6] as well as the chief negotiator for the state,[7] would obviously profit from instructions by this court as to the parameters of the law. Similarly, the labor relations board, vested with the power to resolve labor disputes, *see* HRS § 89-5 (Supp.2001), and the legislature, which must approve or reject cost items in collective bargaining agreements, *see* HRS § 89-10 (1993), would gain from the direction provided by this court.

Thirdly, as discussed *infra*, it reasonably can be said that the issues raised are likely to reoccur. Limitations on collective bargaining as exemplified by Section 2 are potentially raised whenever fiscal crises arise in state and county government. *Cf. Schulz v. Silver*, 212 A.D.2d 293, 294, 295 n. 1, 629 N.Y.S.2d 316 (N.Y.1995) (explaining that "this litigation has its genesis in the recurring failure of the Legislature to adopt a

---

**6.** HRS § 89-9(a) (Supp.2001), outlining the scope of negotiations between public employees and the government, states that "[t]he employer and the exclusive representative shall meet at reasonable times ... and shall negotiate in good faith[.]" For purposes of the Collective Bargaining in Public Employment Act, "employer" includes

[t]he governor in the case of the State, the respective mayors in the case of the city and county of Honolulu and the counties of Hawai'i, Maui, and Kauai, the board of education in the case of the department of education, and

the board of regents in the case of the University of Hawai'i, and any individual who represents one of these employers or acts in their interest in dealing with public employees. In the case of the judiciary, the governor shall be the employer for the purposes of this chapter. HRS § 89-2 (1993).

**7.** HRS § 89A-1 (Supp.2001) established the "office of collective bargaining and managed competition" and the position of chief negotiator, both of which assist the governor in collective bargaining policy. *See* HRS § 89A-1(a)-(c).

budget on or before April 1, the commencement of the State's fiscal year" and determining that, "[t]o the extent that it could be asserted that the passage of the State budget has rendered this matter moot, we find, under the circumstances present here, that an exception to the mootness doctrine would lie" (citation omitted)); *New Haven v. State Bd. of Educ.*, 228 Conn. 699, 638 A.2d 589, 591 n. 2 (1994) (in case where question was whether a town met statutory minimum expenditure requirements in its appropriation of funds to board of education, holding that the issue was not moot, despite town's compliance with injunction order, because it was "apt to evade review because it involves an annual budget"). The fact that this state has been in intermittent financial crises since the 1990's is not a matter that escapes judicial notice. In the nature of things, it is unreasonable to conclude that questions concerning the collective bargaining process and limitations on, or the deferral of, government expenditures would not appear again.

### B.

That the issues raised in the instant case are likely to reoccur was the unanimous position of the parties. All parties to this suit at oral argument maintained that this case is not moot, inasmuch as these issues will arise in the future.[8] *Cf. Philipsburg–Osceola Educ. Ass'n by Porter v. Philipsburg–Osceola Area Sch. Dist.*, 159 Pa.Cmwlth. 124, 633 A.2d 220, 222 n. 5 (1993) (explaining that, while issue on appeal was arguably moot, appellate court would not dismiss case as moot, in part because "neither party has

raised the issue of mootness and we did not have the opportunity to present the issue to them; although this case was originally to be heard at oral argument, the parties chose instead to submit it on briefs"). For example, Plaintiffs' counsel maintained that the controversy "by its very nature" is likely to re-emerge in the future, and that this court must take the opportunity to declare the rights of public employees to collectively bargain.

Counsel for the State was asked whether it was in the State's interest for this case to be ruled moot. He answered, "No," and, like Plaintiffs' counsel, urged that this court define the legislature's power with respect to collective bargaining rights. Citing a pending circuit court case, he argued that "this issue arises often[.]" The State's counsel asserted that the questions surrounding collective bargaining rights "will come up again and again and it will never be resolved." Finally, counsel for the mayor of Kaua'i county agreed that the instant issues are subjects of public interest likely to return in the future.

### VI.

Indeed, nearly all of the public employee unions in this state, the governor, and the mayors of each county are parties to this suit and have already extensively briefed and argued this case before the circuit court. The circuit court entertained eighteen motions filed by the parties and held hearings therefor. It has issued fifty-seven extensive find-

---

8. In this case, we had the invaluable benefit of oral argument. As stated in *Blair v. Harris*, 98 Hawai'i 176, 45 P.3d 798 (2002),

> [i]n deciding cases such as this one, the benefit of oral argument is evident. "Oral arguments can assist judges in understanding issues, facts, and arguments of the parties, thereby helping judges decide cases appropriately." (Quoting R.J. Martineau, *The Value of Appellate Oral Argument: A Challenge to the Conventional Wisdom*, 72 Iowa L.Rev. 1, 4 (1986)).... A dialogue among the members of the court and counsel, which is the essence of oral argument, enlivens the written briefs, heightens our awareness of what is significant to the parties, and invigorates our analytical senses.
> ....

> ... It has been observed that "the principal purpose of the argument before the [United States Supreme Court] Justices is ... to communicate to the country that the Court has given each side an open opportunity to be heard [and, t]hus[,] not only is justice done, but it is publicly seen to be done." B. Schwartz & J.A. Thomson, *Inside the Supreme Court: A Sanctum Sanctorium*, 66 Miss. L.J. 177, 196 (1996). This consideration—that justice should always be seen to be done—is applicable to all appellate courts. It is our duty as the court of last resort in this state to foster and maintain this hallmark of American judicial process.

*Id.* at 187, 45 P.3d at 809 (Acoba, J., dissenting in part and concurring in part) (some brackets in original.)

ings of fact and nineteen lengthy conclusions of law totaling twenty-two pages. All issues have been thoroughly briefed to this court in fourteen written briefs totaling 349 pages. Oral argument has been had before this court.

Moreover, the issues to be decided are questions of law, which (1) constitute subject matter plainly and particularly within the province and competence of this court, and (2) as the court of last resort in this state, we are responsible to decide. What we have here is not a depletion of scarce resources, but what would be a waste of substantial time and resources already expended by the parties and the judiciary were this case held to be moot. Plainly, this case falls within the public interest exception to the mootness doctrine.

## VII.

### A.

This case also fulfills the requirements of the "capable of repetition yet evading review" formulation, as that test was recently expounded by this court. As was clarified in *Okada Trucking*, this test does not demand certainty, but only the *likelihood* that "similar questions" arising in the future would become moot:

> [T]he exception to the mootness requirement does not require absolute certainty that the issue will evade review; *all that is required is that "it is likely in the nature of things that similar questions arising in the future would likewise become moot* before a needed authoritative determination by the appellate court can be made."

*Okada Trucking*, 99 Hawai'i at 198 n. 8, 53 P.3d at 806 n. 8 (emphasis and brackets omitted) (emphasis added) (quoting *Johnston*, 50 Haw. at 381, 441 P.2d at 140).

Undoubtedly, the legal questions are "capable of repetition." Other jurisdictions have determined, in various circumstances, that questions related to employee-union relations qualify under this exception. *See Central Dauphin Educ. Ass'n v. Central Dauphin School Dist.*, 792 A.2d 691, 701 n. 11 (Pa.Cmwlth.2001) (characterizing as "capable of repetition yet likely to evade re-

view[,]" appeal from an injunction which required school district to employ teachers in compliance with an expired collective bargaining agreement; despite fact that subsequently, new agreement was ratified); *Goodson v. State*, 228 Conn. 106, 635 A.2d 285, 289 (1993) ("[W]e conclude that the question of whether a trial court may reinstate a discharged state employee pending the operation of a contractual grievance procedure is a fundamental labor relations issue likely to arise again, yet apt to evade review."); *Hartford Principals' & Supervisors' Assn. v. Shedd*, 202 Conn. 492, 522 A.2d 264, 265 (1987) (where question was whether mediation is available to resolve contractual dispute between employer and employee arising during existing contract, such question is "capable of repetition" and not moot, even though collective bargaining agreements expired prior to appeal).

### B.

The issues raised in this case are also *likely* to evade review. In *Okada Trucking*, we applied the evading review exception where the question was whether a city procurement contract violated the Hawai'i Public Procurement Code, even though the contract granted had already been completed. We explained that the history of the case illustrated how "the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit." *Okada Trucking*, 99 Hawai'i at 197, 53 P.3d at 805 (internal quotation marks and citation omitted). In the instant case, as in *Okada Trucking*, "the passage of time" has "prevent[ed] ... [P]laintiff[s] from remaining subject to the restriction complained of for the period necessary to complete the lawsuit." *Id.* It has been over three years since the legislature passed the legislation at issue, three years since the suit was filed, and more than two years since the order was entered, and the parties remain without an "authoritative judicial decision regarding the important legal questions raised ... in [this] appeal." *Id.* For the foregoing reasons, the "capable

of repetition, yet evading review" exception also applies.